UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JEFFERY DEAN BLACK,<br><br>      Plaintiff,<br><br>    v.<br><br>IRVING MATERIALS, INC.,<br><br>      Defendant. | Case No. 17-CV-06734-LHK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff and Counterdefendant Jeffery Dean Black ("Black") registered the imi.com domain name in March of 1994. Defendant and Counterclaimant Irving Materials, Inc. ("Irving"), an Indiana concrete and construction materials supplier, registered the IMI trademark, which is the acronym of "Irving Materials, Inc.," in 1995. The parties dispute whether Black cybersquatted on the imi.com domain name.

The Court held a 3-day jury trial in this matter beginning on June 10, 2019. On June 14, 2019, the jury rendered a verdict. Specifically, the jury found that Irving failed to prove its Anti-Cybersquatting Consumer Protection Act counterclaim ("ACPA cybersquatting counterclaim"). In its advisory capacity, the jury also found that Black proved his declaratory relief claim that Black lacked bad faith intent and thus did not violate the Anti-Cybersquatting Consumer Protection Act

("ACPA") pursuant to 15 U.S.C. § 1114(2)(D)(v) ("subsection (v) declaratory relief claim").

Because the jury found for Black on his subsection (v) declaratory relief claim that Black did not violate the ACPA in the jury's advisory capacity only, and because the jury was not asked to render an advisory decision on Irving's counterclaim for declaratory relief that Black violated the ACPA, the Court must issue a ruling on these two claims.

Having considered the evidence and arguments of counsel, the relevant law, and the record in this case, the Court hereby enters the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

### A.  Factual Background

### 1.  Black Registers imi.com and Incorporates Internet Marketing Inc.

Since at least the mid-1990s, Black has invested significant time and money developing various internet entities, projects, and businesses. *See* 6/10/19 Transcript at 178–82. Black is also one of the first people to register domain names: "I was again one of the main speakers in the world going around talking about the internet is coming to get people to go online. My job was kind of, let me help convince all of the people in the world that this new thing, going from what we called the ARPAnet at the time, which only colleges used, and let's get people to go on to the internet. Something you take for granted today, back then it was all dial up. No one was doing it. My job was to make awareness to everybody in the world why they should do that." *Id.* at 182:20–183:4.

In March of 1994, Black acquired and registered for free the domain name at issue in this case, imi.com. *Id.* at 183:15–184:5, 191:19–23. Black associated his home address, his home phone number, his cell phone number, and his pager with the imi.com domain name from 1994 to 2019, and all of this information was listed on WHOIS. *Id.*; 6/11/19 Transcript at 281:11–14.

On April 6, 1994, Black also incorporated an entity named Internet Marketing Inc., which was the first company Black ever created. 6/10/19 Transcript at 197:12–18, 236:20–22; BX-2 (Certificate of Incorporation of Internet Marketing Inc.). At the time he created Internet Marketing Inc., he was not aware of any other IMI business. 6/10/19 Transcript at 191:10–14. When Black

registered imi.com, Black was not aware of Irving: "I had no idea who Irving Materials was. I had never been out in Indiana. I've never seen any of their trucks driving here in California. I had no intent at all to profit off of their site." 6/11/19 Transcript at 303:12–304:10.

Black testified that the first thing he did with Internet Marketing Inc. and the imi.com domain name after he registered it was that he started building some directories and spiders, which Black explained were "some software that [he] would write that would say, 'I want you to go out to every, every machine on the internet, and on your way, keep track of every little machine you bounce to, or routers.'" 6/10/19 Transcript at 184:13–185:1, 201:9–14. Black further explained: "then I reversed that backwards and turned that into the first internet service provider listing in the world that would show how many people were behind each ISP at the time. An ISP is an internet service provider." *Id.* at 184:13–185:1.

In 1994, Black used imi.com to create a website that had "Internet Marketing, Inc." across the top of the page. *Id.* at 185:2–6; JX-5 (copy of imi.com from 1998). The Internet Archive Wayback Machine, available at archive.org, was not created until 1996 and did not start collecting websites until mid to late 1997, so the Wayback Machine did not have a copy of imi.com from 1994 to 1996. 6/10/19 Transcript at 188:3–14. Black explained that in 1994, 1995, and maybe part of 1996, imi.com described Internet Marketing Inc. as a "data aggregator." *Id.* at 230:14–232:5.

Black used imi.com and Internet Marketing, Inc. to hold the data of his clients, and to create internet directories. *Id.* at 188:16–189:16. Black displayed the IMI mark on his website, documents, around 30 or more non-disclosure agreements, business plans for corporations, presentations and pitch decks. 6/10/19 Transcript at 189:23–190:8, 203:3–17; BX-3 (1994 NDA); BX-4 (Internet Marketing Inc. business records dated 1994). Black shared his IMI mark with companies, including Oracle, Microsoft, Yahoo, Digital Equipment, American Business Information, NW Ayer Incorporated, Excelsior, and Digex. 6/10/19 Transcript at 215:1–8, 216:8–221:14. Black does not have many records left from Internet Marketing Inc. because Black sold the company to AltaVista for $25 million, and the records then became AltaVista's property. 6/10/19 Transcript at 203:17–25.

3

Nonetheless, Black testified as to Internet Marketing Inc.'s relationships with the above-mentioned companies. For instance, Black explored working with Jerry Yang, the co-founder of Yahoo, to build an online directory of company names on the internet because Yahoo was manually entering information but Black had a method of automatically building databases online using his spiders. *Id.* at 221:11–222:14, 229:2–18. In support of his discussion about Internet Marketing Inc.'s business relationship with Yahoo, Black introduced exhibit BX-5, which is a 1994 email from Jerry Yang to Black, which concludes: "To summarize, we are impressed by the resource and talent pool that IMI has pulled together. We share much of the vision that IMI does, and see a good potential fit. Of concern to us is the relative worth of Yahoo, the amount of resources Yahoo will receive from IMI in the short run and long run, the autonomy of Yahoo (both short and long term), and the pace at which things will be accomplished." BX-5.

Black's company also had a relationship with the Emmy Awards throughout the period of 1994 to 1999. 6/10/19 Transcript at 234:11–236:11. Sometime during that 1994 to 1999 period, imi.com hosted a live broadcast of the Emmys through the alias "bigalpha.imi.com." *Id.*

### 2. Black Changes the Corporate Form of Internet Marketing Inc.

Black rolled Internet Marketing Inc. into two other entities. *Id.* at 232:11–25. Specifically, Internet Marketing Inc. had started as an S Corp that was tied to Black's social security number, but because venture capitalists would not fund S Corps, Black had to change the corporate form. *Id.* at 232:11–25, 236:13–22. Thus, Internet Marketing Inc. was rolled into a company called iChannel in 1996, which was then later rolled into iAtlas in 1998. *Id.* at 236:15–16; 6/11/19 Transcript at 277:12–16, 312:16–314:4. Black worked with the law firm of Hale & Dorr to make sure that all of Internet Marketing Inc.'s records moved with the new companies. 6/10/19 Transcript at 232:11–25.

In support of his testimony about the changes to Internet Marketing Inc.'s name, Black introduced into evidence BX-13, which was a January 24, 2000 letter from the Chestnut Partners Team—the venture capital firm that funded Black's company—regarding the changes. 6/11/19 Transcript at 377:13–23. BX-13 stated: "Dear Jeffery, Now that you have changed the Company's

name yet again and the original iAtlas (or iChannel, ODS, or IMI) team is scattered across the country, please accept the enclosed as a token to remember the search engine that changed the way people surf the Web. We wish you the best of luck in all of your future successes." BX-13.

Internet Marketing Inc. is listed on the Delaware Department of State, Division of Corporations website as a "[v]oid, AR's or [t]ax [d]elinquent" entity since March 1, 1997. BX-2 at Black_000326. However, Black testified that he was paying taxes into June of 1997. 6/10/19 Transcript at 198:1–200:24; BX-2 at Black_000021 (blank tax return).

### 3. Acquisition by AltaVista

Black then entered into negotiations to sell iAtlas to AltaVista. Around October 1998, AltaVista specifically asked Black to take the imi.com website down to avoid any confusion about the company's name. 6/10/19 Transcript at 241:21–25, 249:24–250:16; 6/11/19 Transcript at 279:20–280:9. Black thus took imi.com down in October 1998. 6/10/19 Transcript at 241:21–25, 249:24–250:16; 6/11/19 Transcript at 279:20–280:9.

In 1999, Black sold iAtlas to AltaVista for $25 million. 6/10/19 Transcript at 237:24–238:15; 6/11/19 Transcript at 277:12–22, 314:5–10; BX-13.[1] This transaction included all of the assets from Internet Marking Inc. going back to 1994, with the exception of the imi.com domain name, which AltaVista allowed Black to keep. 6/11/19 Transcript at 277:12–278:21. Black then went to work for AltaVista. *Id.* at 314:6–9.

### 4. Black's Other Domain Names

In 1994, Black also registered other domain names, including "hiking, biking, scuba, tennis, recreation, hotels.com, [and] resorts.com. Obviously, IMI was the first one I did. There might be a couple others that I did," perhaps "ten, fifteen, something like that. They're all generic terms." 6/10/19 Transcript at 191:24–192:25. Black's plan for hotels.com and resorts.com was to build the first online booking reservation system in the world. *Id.* For hotels.com, Black built a booking reservation system complete with maps, and hand coded over 40,000 hotels into the

---

[1] AltaVista was later acquired by Overture, which was then acquired by Yahoo. 6/10/19 Transcript at 237:24–238:15.

database. *Id.* at 193:18–194:15. Black ultimately sold resorts.com in 1999 for $950,000 and hotels.com in 2001 for $11 million. *Id.* at 195:8–21. Black gave away the hiking, biking, scuba, tennis, and recreation domain names for free. *Id.* at 195:22–197:11.

### 5. Irving Materials, Inc.

Defendant and Counterclaimant Irving is an Indiana concrete and construction materials supplier that does business in Indiana, Kentucky, Tennessee, Illinois, Ohio, Michigan, and Alabama. 6/14/19 Transcript at 652:9–11.

At trial, the jury heard evidence about Irving's use of its IMI trademark. Jason Richmond, Irving's Director of Marketing and Business Development, testified that between 1965 to the present, Irving used the IMI trademark on fleet vehicles, ready mix concrete trucks, uniforms, building signage, billboards, business cards, price sheets, marketing materials, and promotional items. *Id.* at 635:13–636:7; D Ex.1. In 1962, Irving built the corporate office in Greenfield, Indiana and displayed the IMI trademark on the front of that office. 6/14/19 Transcript at 643:1–9; D Ex.1 at 85–86. Irving introduced into evidence a brochure from the 1962 original open house when Irving moved into the new corporate headquarters that displayed the IMI trademark. 6/14/19 Transcript at 647:19–24; D Ex.1 at 45–49. In 1968, Irving displayed the IMI trademark on the company letterhead. 6/11/19 Transcript at 645:22–646:5; D Ex.1 at 266–67. In 1981, Irving displayed the IMI trademark and the goods that Irving provides—"concrete, gravel, stone, and sand"—on a brochure that Irving handed out to customers. 6/14/19 Transcript at 648:6–18; D Ex.1 at 2–5. Irving has displayed the IMI trademark on Irving's website, irvmat.com, since 1996. 6/14/19 Transcript at 636:21–23.

However, Irving's exhibits showed that Irving almost always used the IMI trademark simultaneously with the company's full name: "Irving Materials, Inc." *See* D Ex.1. Indeed, Jeffrey McPherson, Irving's Vice President of Sales and Marketing, stated that although Irving used the IMI trademark on all of the above described materials, Irving almost always used the acronym "IMI" with the company's full name, "Irving Materials, Inc." 6/14/19 Transcript at 585:22–586:12.

McPherson further testified about Irving's registration of its IMI trademark. Irving filed its trademark registration application on September 19, 1994, and Irving's IMI trademark was registered on September 19, 1995. 6/11/19 Transcript at 519:5–18; D Ex.11. The specific goods covered by the registration were "concrete and construction aggregates, including sand, gravel, stone, and concrete in Class 19." 6/11/19 Transcript at 519:13–19; D Ex.11. In its registration, Irving stated that Irving first used IMI on January 1, 1965, and that it first used IMI in commerce on March 1, 1991. 6/11/19 Transcript at 519:20, 525:11–17; D Ex.11.

### 6. Irving Offers to Buy imi.com from Black

Jerry Howard, Irving's Vice President of IT and former Director of IT, testified that Irving's website is irvmat.com. 6/11/19 Transcript at 397:14–20. Irving first put up its website in 1996. 6/14/19 Transcript at 636:21–23. Howard first learned of the imi.com domain name in 1998. *Id.* at 402:22–24. Howard explained that from a search on WHOIS, Howard learned that Black was the owner of imi.com and that Black had registered imi.com in 1994. *Id.* at 405:1–11.

In the summer or fall of 1998, Howard approached Black to buy the imi.com domain name for Irving. 6/10/19 Transcript at 240:22–241:8; 6/11/19 Transcript at 415:9–25. Howard had between two to five calls with Black regarding purchasing imi.com. 6/11/19 Transcript at 415:24–416:16.

Black explained that at the time Howard approached Black in 1998, Black was not looking to sell imi.com. 6/10/19 Transcript at 240:22–241:8. According to Black, Irving offered Black $500 for his imi.com domain name, which Black rejected. *Id.* at 242:2–15. Black testified at trial: "I said, I'm sorry. Hold on. Let me explain something here. My business is called Internet Marketing, Inc. It's still running. I'm the biggest spider in the world for what I do. I track more data than anybody else in the world as a data aggregator. $500 isn't going to cut it." *Id.* Black testified that he calculated what it would cost him to convert everything over, including his DNS servers, his web content, software, and contracts. *Id.* at 242:16–243:7. In support of Black's discussion that he calculated what it would cost him to sell imi.com, Black introduced exhibit BX-12, which is a 1998 document that contains Black's calculations. *See* BX-12. BX-12 shows that

Black calculated that the changeover would cost him $126,800, and wrote that he would consider no offer that was less than $135,000. BX-12; 6/10/19 Transcript at 243:4–25.

According to Howard, Howard never offered to purchase imi.com for $500. 6/11/19 Transcript at 416:4–13. Instead, Howard offered to purchase imi.com for $5,000 then $10,000. *Id.*; 6/14/19 Transcript at 609:25–610:8. Howard testified that Black rejected the $5,000 and $10,000 offers; that Black said that those offers were too low; and that Black said he had turned down offers of more than $100,000. 6/14/19 Transcript at 609:25–610:8; 6/11/19 Transcript at 416:11–417:13. Howard testified that he does not recall Black mentioning the $135,000 figure. *Id.*

According to Black, Irving refused his $135,000 figure, repeated the $500 figure, and threatened to sue Black for trademark infringement. In fact, on October 2, 1998, Irving emailed Black a draft complaint suing Black for trademark infringement in the United States District Court for the Southern District of Indiana, in Indianapolis. BX-12 at Black_000267–74 (10/2/98 email with complaint); 6/10/19 Transcript at 243:4–25, 248:1–249:7.

As explained above, around that same time, in October 1998, Black had taken the imi.com website down at the request of AltaVista. 6/10/19 Transcript at 241:21–25, 249:24–250:16; 6/11/19 Transcript at 279:20–280:9. Black testified that on October 7, 1998, Black emailed Irving to tell Irving that Black took the imi.com website down and that there could be no infringement. 6/10/10 Transcript at 247:22–250:9. JX-6 is the exhibit that contains Black's October 7, 1998 email. Black wrote in the October 7, 1998 email that "I have recently removed the site from the web —therefore, no trademark infringement exists at this time." JX-6.

To handle Irving's threats to sue for trademark infringement, Black hired litigation attorneys to represent him. 6/10/10 Transcript at 243:19–248:7. Black testified that his attorneys handled the situation with Irving and told Black that he would not hear from Irving again. *Id.* at 243:19–244:11, 250:11–16. Indeed, Irving never filed the suit for trademark infringement in the United States District Court for the Southern District of Indiana. 6/10/19 Transcript at 251:22–25; 6/14/19 Transcript at 610:22–24.

Jerry Howard, Irving's current Vice President of IT and former Director of IT, testified that

8

Black had stated that he had taken the imi.com website down. 6/11/19 Transcript at 424:22–426:21; 6/14/19 Transcript at 610:22–611:3 (Howard explaining that Irving ultimately did not sue Black "because he responded to our lawyers indicating—or acknowledging the trademark infringement and indicated that he was taking the website down"); JX-6. Howard confirmed that imi.com was down as of October 1998. 6/11/19 Transcript at 424:22–426:21.

Howard would randomly check to confirm imi.com was still down from October 1998 on, but he stopped after a year and a half or two because "it didn't seem like there was any need to check anymore," the website "had been down for a longer period of time," and "based on what I saw in the [October 7, 1998] email, I never thought it would come back up." *Id.*

### 7. Black Receives Other Offers to Buy imi.com Between 2000-2002

Black left AltaVista during the end of 2000 or the beginning of 2001. 6/11/19 Transcript at 280:1–25. Between 2000-2002, Black received offers from seven or more companies for the imi.com domain name. *Id.* at 284:19–285:16, 286:22–289:8. One of these offers included an offer from a company called Piezotronics for $2 million. *Id.* at 286:22–289:8; BX-14. Another offer was for $4 million. 6/11/19 Transcript at 289:17–291:16. Black also testified that he was in discussions with Israeli Military Industries and that Black believes that their offer was upwards of $2 million. *Id.* at 374:1–16.

Black further testified that business.com, a domain name for which Black had no involvement, sold sometime between 2000-2002 for $7 million. *Id.* at 375:23–376:3.

### 8. Black Puts imi.com Back Up in 2002

Black testified that in 2002, Black put imi.com back up. Specifically, Black put up a free directory on imi.com for companies with the IMI name. *Id.* at 281:9–282:2; JX-7 (screenshot of imi.com from 2002 showing directory of companies with IMI name). Black created the directory using the names of companies that had reached out to Black to purchase the imi.com domain name, including Irving. 6/11/19 Transcript at 282:11–284:7. Black explained that Black was not trying to profit from these companies, but rather was redirecting to these companies' websites any traffic that came to imi.com but was intended for these companies. *Id.* One company requested to

be removed from the directory, and one company requested to be added. *Id.* Black complied with both requests. *Id.*

On the imi.com website, Black also advertised that the imi.com domain name was for sale, but that he would not sell it for less than $2 million. *Id.* at 285:6–25; JX-7. Black testified that his attorneys approved of his actions and that Black had no reason to believe that what Black was doing was illegal. 6/11/19 Transcript at 286:11–23. Ultimately, Black did not sell the imi.com domain name, and Black kept the directory on the website through 2018. *Id.* at 293:1–294:18; JX-8.

### 9. Black Forms International Monetary Investments LLC

In 2016, Black incorporated his new company, International Monetary Investments LLC. 6/11/19 Transcript at 252:15–23, 294:19–296:24. In December 2016, Black decided to license his imi.com domain name to his International Monetary Investments LLC company. *Id.* at 296:25–BX-15 (12/4/16 domain use and license agreement for imi.com and imi.info between Black and International Monetary Investments LLC).

International Monetary Investments LLC entered into 300 contracts with clients, and a majority of the agreements were signed in 2016. 6/11/19 Transcript at 298:15–301:15. Because International Monetary Investments involved financial services, Black had to track every one of his contracts and register the contracts with the United States Treasury Department. *Id.* at 298:4–25. Black testified that because the United States Treasury Department scrutinized International Monetary Investments LLC, Black was "not going to do anything wrong." *Id.* at 306:15–20. Black was required to notarize his International Monetary Investments LLC contracts and to have the other contracting party "run though" the Department of Homeland Security or Interpol to "make sure they're good people." *Id.* at 310:14–19.

### 10. Irving Hires the Heavyweights and Changes Their Marketing Strategy

Jason Richmond, Irving's Director of Marketing and Business Development, testified that in 2014, Irving developed a new marketing and branding strategy to shift Irving's investments to digital and online advertising. 6/14/19 Transcript at 650:6–651:12; JX-12 (IPFW Report for

United States District Court
Northern District of California

Irving). In 2015, Irving hired an advertising firm known as the Heavyweights. 6/14/19 Transcript at 652:17–653:9. In June through October of 2016, Irving and the Heavyweights interviewed employees and customers and learned that Irving is "known as IMI everywhere but online." *Id.* at 653:6–655:7. Thus, Irving sought to build its online presence.

Jeffrey McPherson, Irving's Vice President of Sales and Marketing, testified similarly. In 2014, after McPherson got his position as the Vice President of Sales and Marketing at Irving, Irving began conducting consumer research on Irving's marketing. 6/11/19 Transcript at 497:17–503:9. Irving then hired the Heavyweights, an advertising firm, to look into how Irving was branding. *Id.* McPherson testified that: "it was suggested to us," that "it would be good not to confuse the marketplace and we should go after imi.com." *Id.* at 503:10–15.

McPherson further testified that the advertising firm helped him look into the imi.com domain name and "it appeared that [Black] wasn't offering any goods or services through the web, and that's when [the advertising firm] informed me that [Irving] could hire an attorney" and file a Uniform Domain Name Dispute Resolution Policy ("UDRP") complaint. 6/14/19 Transcript at 582:24–583:2. McPherson looked up the imi.com website and saw that the website stated that imi.com was for sale and that "offers less than 2 million dollars will not be considered." *Id.* at 583:17–84:6. McPherson thought that was a ridiculous offer. *Id.* at 584:4–9.

When asked "between 1998 and 2017, why did Irving not say a word to Black about his registration and use of the [imi.com] domain name?," McPherson responded: "different strategy we have right now after going through the research and things of that nature that we've gone through. And also the way the website, social media apps and everything interact[s] with one another, it's my job to make sure our brand is consistent throughout our footprint, consistent throughout the country, consistent everywhere we operate." 6/11/19 Transcript at 503:24–504:6. The dialogue continued:

Q. So you're saying because the internet got bigger, it made it more important for you to have Mr. Black's property as your own?

A. I'm not saying the internet. I'm saying marketing and branding in general to begin

11

with. Branding is what people remember when the marketing stops.

Q. I'm asking you to explain all reasons that Irving Materials did not reassert its cybersquatting claim from 1998 for 19 years.

A. I would say the biggest reason would be the research that I did when I first got the Vice-President of Sales and Marketing role. And also the other thing is, when did the UDRP start? We didn't have any way of doing anything.

Q. Are you aware the UDRP went into effect in the year 2000, Mr. McPherson?

A. I am now.

*Id.* at 504:7–23.

Jerry Howard, Irving's Vice President of IT and former Director of IT, also testified similarly. Specifically, Howard explained that he was prompted to look at Black's imi.com website sometime in 2017 after the advertising firm began its digital advertising efforts, and it was at that time that Howard learned of Black's relaunch of imi.com. 6/14/19 Transcript at 614:13–616:10; JX-8. Black never contacted Irving to tell Irving Black was planning on relaunching the website. 6/14/19 Transcript at 617:7–618:5. Howard testified that no confusion about the imi.com website was reported to Irving. *Id.* at 624:14–625:10. Howard admitted that between 2000 and 2017, Irving was not policing its trademark. *Id.* at 628:20–629:6. Howard also testified that between 2003 and 2017, Howard did not know that Black offered to sell the website. *Id.* at 617:7–618:5. Howard testified that Irving did not approach Black in 2017 to buy the imi.com domain name because "from [1998] until 2018, the website had changed very little. There's—it didn't look like there was any more bona fide business in 2017 than there was in 1998, and in 2017, the price went from in excess [of] $100,000 to in excess of [$]2 million. And it seemed to be outrageous back then and unreasonable, and then it only got more unreasonable in 2017." *Id.*

**11. Irving Files the UDRP Complaint Against Black in 2017**

In October 2017, with the help of the Heavyweights advertising firm, Irving filed the UDRP complaint against Black. 6/14/19 Transcript at 584:9–11; 6/11/19 Transcript at 301:14–21, 503:16–19.; 6/10/19 Transcript at 252:7–19; 6/11/19 Transcript at 301:14–21. Specifically, Irving alleged that Black was cybersquatting on the imi.com domain name, and Irving sought to transfer

imi.com to Irving. *Id.*

**12. The UDRP Complaint's Impact on International Monetary Investments LLC**

Black testified that Irving's 2017 filing of the UDRP complaint resulted in the suspension of Black's imi.com domain name: "all of a sudden, I couldn't do anything because when [Irving] filed a complaint, it turns out there's some crazy rule that when you file a complaint, somebody gets to freeze your DNS, they get to freeze your website, they get to freeze everything." 6/10/19 Transcript at 252:23–253:2; 6/11/19 Transcript at 301:22–302:1.

Black testified that the suspension adversely affected him because, at the time, Black was repurposing imi.com to use for his new company, International Monetary Investments LLC, and because Black was going through due diligence to get venture capital funding for International Monetary Investments LLC. 6/10/19 Transcript at 252:15–23. Specifically, in 2017, Black got an offer from one of his venture capital contacts to invest $10 million in International Monetary Investments LLC. 6/11/19 Transcript at 310:10–311:7. However, that venture capitalist walked away when he found out that Black was accused of cybersquatting. *Id.* As a result, Black lost all of his funding to help service his 300 contracts. *Id.* Black further testified that before March 22, 2018, Black bought a million dollars' worth of product. *Id.* at 354:17–355:11.

**13. Black files the Instant Suit**

On November 21, 2017, Black filed the instant lawsuit, which seeks to enjoin Irving's efforts to force Black to transfer the imi.com domain name to Irving. ECF No. 1. On March 22, 2018, Black filed his first amended complaint. ECF No. 11.

At trial, Black testified that March 2018—four months after he filed the instant lawsuit— was the first time he could make changes to the imi.com website because that was when the suspension on imi.com was lifted. 6/11/19 Transcript at 354:10–355:4. Black testified: "That's the first time I could literally do it once you blocked me from making any changes." *Id.*

**14. The Impact of Irving's Delay on Black's Access to Witnesses and Documents**

Black also testified that Irving's delay from 1998 to 2017 adversely affected Black. For instance, because AltaVista had acquired Internet Marketing Inc.'s records in 1999, Black is no

13

longer in possession of Internet Marketing Inc.'s records. 6/10/19 Transcript at 237:24–238:15;

6/11/19 Transcript at 308:24–209:2. Those records are no longer available because AltaVista no

longer exists because it was acquired by Overture and then later by Yahoo. *Id.* at 315:24–317:1.

Of the email records for which Black had copies, Black testified that he used his imi.com

email up until around 2008, when Black's server crashed. 6/10/19 Transcript at 237:10–25. At that

point, Black lost all of the email records on his server. *Id.* Black's lack of records has made it

difficult for Black to defend himself against Irving's 2017 claims of cybersquatting. 6/10/19

Transcript at 238:13–240:6.

Black testified that he also has lost witnesses who could have testified about Internet

Marketing Inc. *Id.* at 240:7–22. For instance, Mike Burns, who was one of Black's "key guys for

bringing data down for Info USA," and who had "got [Black] 12 million business records," died

of cancer around 2000. *Id.*; 6/11/19 Transcript at 309:20–25. Mike Burns's boss died about a year

later. 6/11/19 Transcript at 309:24–25. Paul Flaherty, who was one of the original inventors for

AltaVista and who also did a lot of work with Black, died about six years ago of an aneurism.

6/10/19 Transcript at 240:7–22; 6/11/19 Transcript at 309:15–19. Additionally, "the chief

scientist" who "worked for Dun and Bradstreet," "allowed this type of data to be licensed," and

quit his job to work for Black, also died. 6/11/19 Transcript at 310:1–6. Thus, Black testified "so

I've lost all my witnesses, all my main witnesses, and I'm trying to defend myself now." *Id.* at

310:8–11.

**15. Dr. Wright's Testimony Regarding Other IMI Trademarks and Irving**

Dr. James Wright, a consumer psychologist and Black's expert, testified that 19 IMI

trademark registration certificates had been issued on or before 1994. 6/11/19 Transcript at

430:22–25; BX-17. Dr. Wright further testified that as of 2018, there were 71 live IMI trademark

registrations. 6/11/19 Transcript at 431:1–7; BX-17.

On cross examination, Dr. Wright acknowledged that 16 of the 19 marks that were

registered on or before 1994 had subsequently been cancelled or suspended. 6/11/19 Transcript at

481:17–23. On cross examination, Dr. Wright also acknowledged that none of the registrations

14

were for concrete and aggregates, which are the products that Irving sells. *Id.* at 489:3–5.

Dr. Wright testified about JX-12, which was a study paid for by Irving that shows the limited geographical reach of Irving. JX-12 at 8; 6/11/19 Transcript at 440:7–444:1. Specifically, the study shows that Irving's "footprint, their marketing, where they sell [their] product, where they market their product, is strictly limited to Indiana and the bordering areas of the states surrounding it." 6/11/19 Transcript at 443:9–14; JX-12 at 8. Dr. Wright also cited another page of the study, which showed that Irving was limited to a number of products: "paving, concrete, and aggregates." 6/11/19 Transcript at 443:15–444:1; JX-12 at 11.

### 16. Irving's Allegations of Black's Bad Faith

Jason Richmond, Irving's Director of Marketing and Business Development, testified as to Irving's allegations of Black's bad faith. For instance, Richmond confirmed that he saw a "for sale" page that "prominently advertised imi.com" and "clearly stated, please contact us, but not with offers less than $2 million" only shortly after Black filed the instant lawsuit. *Id.* at 655:8–656:12. Richmond testified that while the instant lawsuit has been pending, the imi.com website has been blank. *Id.* at 656:13–19. However, Richmond testified that Black changed the imi.com website and that, as of June 14, 2019, the day of Richmond's testimony, the imi.com website said, "coming soon." *Id.* at 656:16–20.

### B. Procedural Background

Normally a detailed procedural background is not necessary for findings of fact and conclusions of law. However, the Court finds that a detailed procedural background is necessary here to clarify Black's subsection (v) declaratory relief claim because Black repeatedly tried to alter this claim during trial.

### 1. Black's Claims

In October 2017, Irving initiated a UDRP proceeding against Black for the imi.com domain name. On November 21, 2017 Black initiated the instant suit against Irving. ECF No. 1.

On March 22, 2018, Black filed his first amended complaint ("FAC") and asserted two claims: (1) declaratory relief for a finding that Black lacked bad faith intent and thus did not

violate the Anti-Cybersquatting Consumer Protection Act ("ACPA") pursuant to 15 U.S.C. § 1114(2)(D)(v) ("Count 1" or "subsection (v) declaratory relief claim"); and (2) reverse domain name hijacking by Irving in violation of 15 U.S.C. § 1114(2)(D)(iv) ("Count 2" or "subsection (iv) claim"). ECF No. 11 ("FAC").

Black labeled Count 1, his subsection (v) declaratory relief claim, as "Declaratory Relief -- No Bad Faith Intent/Cyberpiracy (15 U.S.C. §§ 1114(2)(D)(v), 1125(d)(1)(B)(ii))." *Id.* 15 U.S.C. § 1114(2)(D)(v) provides:

> (v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(v). Thus, subsection (v) allows Black to seek injunctive relief to enjoin Irving's efforts to force Black to transfer the imi.com domain name to Irving. Black requested this very relief in his FAC. FAC at 11.

Black labeled Count 2, his subsection (iv) claim, as "Reverse Domain Name Hijacking (15 U.S.C. § 1114(2)(D)(iv))." *See* FAC. 15 U.S.C. § 1114(2)(D)(iv) provides:

> (iv) If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(iv). Thus, subsection (iv) allows Black to seek to hold Irving liable for a knowing and material misrepresentation and to seek damages under the ACPA.

### 2. Irving's Answer and Counterclaims

On May 21, 2018, Defendant and Counterclaimant Irving answered Black's amended complaint and asserted two counterclaims: (1) that Black violated the ACPA (15 U.S.C. § 1125(d)) ("ACPA cybersquatting counterclaim"); and (2) a declaratory relief counterclaim that

16

seeks a declaration that Black violated the ACPA (28 U.S.C. § 2201) ("declaratory relief counterclaim"). ECF No. 25 ("Counterclaims").

### 3. Black's Answer to Irving's Counterclaims and Black's Defenses

On June 11, 2018, Black answered Irving's counterclaims and asserted several defenses, including: (1) the Safe Harbor defense under the ACPA; (2) laches; and (3) acquiescence. ECF No. 28 ("Defenses").

### 4. The Summary Judgment Order and Black's Disregard of the Order

On February 22, 2019, both Black and Irving moved for summary judgment on all claims and counterclaims. ECF Nos. 66 & 70.

Black's Count 2 alleged a violation of subsection (iv). However, in the summary judgment briefing, Black asserted that his Count 2 was not a subsection (iv) claim and that it was actually a subsection (v) claim. ECF No. 83 ("MSJ Order") at 4–5. In his summary judgment briefing, Black further asserted that subsection (iv) is "inapplicable," that Black had made a "typographical error," and that "[t]here is no justification to add the 'misrepresentation' element under subsection (iv)." *See id.* at 5 (citing ECF Nos. 70, 76, & 77).

In the May 6, 2019 summary judgment order, the Court held that Black's Count 2 alleged a subsection (iv) claim and that Black could not change Count 2 on summary judgment. *Id.* Further, the Court held that Black did not defend and had in fact abandoned his subsection (iv) claim on summary judgment. *Id.* at 5–6. Thus, the Court entered judgment on Black's subsection (iv) claim in Irving's favor. *Id.*

In the May 6, 2019 summary judgment order, the Court also denied both Irving's motion for summary judgment and Black's motion for summary judgment as to Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim, and Black's subsection (v) declaratory relief claim. MSJ Order at 18. Specifically, the Court found that "[s]ummary judgment as to the three remaining claims rises and falls together on the issues of whether Irving's trademark [ ] is distinctive and whether Black acted with bad faith intent." *Id.* at 6. The Court found that genuine disputes of material fact as to distinctiveness and bad faith intent precluded

summary judgment on all three claims. *Id.*

Thus, Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim proceeded to trial. Black's subsection (v) declaratory relief claim (Count I), through which Black sought to obtain injunctive relief enjoining Irving from its efforts to force Black to transfer the imi.com domain name to Irving, also proceeded to trial.

Despite the Court's May 6, 2019 summary judgment order, in the May 18, 2019 joint pretrial statement, Black's counsel requested relief for Black's subsection (iv) claim for Irving's violation of the ACPA by reverse domain name hijacking (Count 2). ECF No. 97 at 3 ("Mr. Black requests that the Court . . . [e]nter an order finding that Defendant engaged in reverse domain name hijacking in violation of the ACPA.").

Despite the Court's May 6, 2019 summary judgment order, on May 28, 2019, Black's counsel repeatedly proposed final jury instructions for Black's subsection (iv) claim for Irving's violation of the ACPA by reverse domain name hijacking (Count 2). *See, e.g.*, ECF No. 125 at 3 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking"); *id.* at 115–16 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking.").

Despite the Court's May 6, 2019 summary judgment order, on May 29, 2019, Black's counsel proposed questions for "reverse domain name hijacking against Irving" in his proposed verdict form. ECF No. 135 at 2.

### 5. Order Re: Motions in Limine and Pre-Trial Disputes and the Preliminary Jury Instructions

On May 29, 2019, the Court's Order Re: Motions in Limine and Pre-Trial Disputes stated that Black's subsection (v) declaratory relief claim (Count 1) entitled Black to injunctive relief and not damages. ECF No. 129. Specifically, the Court stated:

> Black is not entitled to seek monetary damages for his [subsection (v)] declaratory relief claim. The Court granted Irving's motion for summary judgment on Black's claim for reverse domain name hijacking in violation of 15 U.S.C. § 1114(2)(D)(iv). ECF No. 83 ("MSJ Order") at 4–6, 18. Therefore, Black's only surviving claim is a claim for declaratory relief regarding no bad faith intent/cyberpiracy pursuant to 15

18

U.S.C. §§ 1114(2)(D)(v) and 1125(d)(1)(B)(ii). *Id.* at 3, 17–18. Neither of those statutory sections provide a right for Black to recover monetary damages. Specifically, 15 U.S.C. § 1114(2)(D)(v) provides only that "[t]he court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant." 15 U.S.C. § 1125(d)(1)(B)(ii) provides that: "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Therefore, the Court finds that Black is not entitled to seek monetary damages for his [subsection (v)] declaratory relief claim.

ECF No. 129 at 8.

### 6. Preliminary Jury Instructions

In the amended proposed preliminary jury instructions, filed on May 30, 2019, the Court described Black's subsection (v) declaratory relief claim as follows: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." ECF No. 131 at 3. Black did not object to this specific instruction in the amended proposed preliminary jury instructions. *See* ECF No. 137.

On June 4, 2019, the Court filed a second set of proposed preliminary jury instructions that made changes to the preliminary jury instructions unrelated to Black's subsection (v) declaratory relief claim. ECF No. 147. Those proposed instructions again described Black's subsection (v) declaratory claim as follows: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." *Id.* at 3. On June 5, 2019, Black filed a notice of no objection. ECF No. 155.

Accordingly, the Court filed the final preliminary jury instructions on June 5, 2019, with the following instruction for Black's subsection (v) declaratory relief claim: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." ECF No. 159 at 3.

### 7. The Jury Trial, the Preliminary Jury Instructions, and Opening Statements

The Court held a jury trial on June 10, 2019, June 11, 2019, and June 14, 2019. ECF Nos.

19

167, 171 & 191.

On June 10, 2019, during the preliminary jury instructions, the jury was instructed as follows as to the parties' claims and defenses:

> To help you follow the evidence, I will give you a brief summary of the positions of the parties:
> Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. Mr. Black has the burden of proving his claim by a preponderance of the evidence.
> Irving Materials, Inc. denies Mr. Black's claim. Irving Materials, Inc. has asserted two counterclaims against Mr. Black: (1) that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act; and (2) a declaratory relief counterclaim that seeks a declaration that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act. Irving Materials, Inc. has the burden of proving its counterclaims by a preponderance of the evidence.
> Mr. Black denies Irving Materials, Inc.'s counterclaims and asserts three defenses: (1) the Safe Harbor defense under the Anti-Cybersquatting Consumer Protection Act; (2) the laches defense; and (3) the acquiescence defense. Mr. Black has the burden of proving each defense by a preponderance of the evidence.

ECF No. 159. at 3.

The jury then heard opening statements from both parties. Despite the Court's May 6, 2019 summary judgment order, the Court's Order Re: Motions in Limine and Pre-Trial Disputes, and the preliminary jury instructions, Black's counsel in his opening statement requested that the jury find that Irving violated the ACPA, which is Mr. Black's subsection (iv) claim (Count 2) that was no longer part of the case. Therefore, the Court struck Mr. Black's counsel's improper statement. Specifically, the Court's exchange with Mr. Black's counsel on June 10, 2019 was as follows:

> Mr. Rodenbaugh: [Mr. Black is] also entitled to a declaration that Irving has violated the law with its exceptionally frivolous, disparaging crusade to steal Mr. Black's Property. Thank you.
>
> The Court: . . . You know, that last sentence, . . . you did not have a claim that Irving violated the law. So is there a reason why you said that in front of the jury when I ruled that was excluded? That is stricken.
>
> Mr. Rodenbaugh: Your honor, I'm sorry. That is not my understanding.
>
> The Court: I've stated multiple times what your declaratory relief claim is, and it's

20

not that Irving violated the law. You want a declaratory relief claim that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. That is your only claim in this trial.

Mr. Rodenbaugh: Okay, your honor.

The Court: All right. So that last sentence is stricken. Mr. Black does not have a claim declaring Irving violated the law. All right? So you're not [to] consider that last claim. That's not a claim in this case.

6/10/19 Transcript at 164–65.

### 8. The Court Again Clarified Black's Remaining Subsection (v) Declaratory Relief Claim

On June 14, 2019, the Court clarified Black's remaining subsection (v) declaratory relief claim (Count 1) in court, outside of the presence of the jury. The Court explained that there was some confusion about Black's remaining subsection (v) declaratory relief claim, both because there is little case law on this claim, and because some courts—as well as the parties—referred to Black's remaining subsection (v) declaratory relief claim as also being titled "reverse domain name hijacking." 6/14/19 Transcript at 574:17–577:17. However, the Court explained that in the preliminary jury instructions, the jurors were instructed as follows as to Black's subsection (v) declaratory relief claim: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." *Id.* The Court explained that the instruction is in line with the statutory text of subsection (v) because subsection (v) only provides declaratory relief for the person accused of cybersquatting. *Id.* Unlike subsection (iv), subsection (v), does not provide an affirmative claim against Irving. *Id.* Thus, the Court explained to the parties that it does not matter what Black's remaining subsection (v) declaratory relief claim is called, it is not an affirmative claim against Irving. *Id.* The Court stated: "[t]hat was your [sub]section (iv) claim which you called reverse [domain] name hijacking, and that claim I granted summary judgment to Irving on. It does not exist. It is not the subject of this trial." *Id.*

### 9. The Jury Trial, the Parties' Rule 50 Motions, and the Jury's Verdict

During trial, the jury heard testimony from Jeffery Dean Black (Plaintiff and

Case No. 17-CV-06734-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Counterdefendant), Jerry Howard (Irving's current Vice President of IT and former Director of IT), Dr. James Wright (Black's expert), Jeffrey McPherson (Irving's Vice President of Sales and Marketing), and Jason Richmond (Irving's Director of Marketing and Business Development).

After Black rested, Black moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 ("Rule 50") on his laches defense. The Court denied Black's motion. ECF No. 169.

On June 14, 2019, after Irving rested, both parties made Rule 50 motions. Specifically, Black again brought a Rule 50 motion on his laches defense, which the Court denied. ECF No. 185. Irving made several arguments in its Rule 50 motion, including that Irving was entitled to judgment as a matter of law on Black's acquiescence defense. Black conceded that he could not prove his acquiescence defense, so the Court granted Irving's Rule 50 motion on Black's acquiescence defense. *Id.* The Court denied Irving's remaining Rule 50 motion. *Id.*

On June 14, 2019, the Court instructed the jury on the final jury instructions, and the parties gave closing arguments. *See* 6/14/19 Transcript; ECF No. 186. The jury then deliberated.

The verdict form asked the jury to determine Irving's ACPA cybersquatting counterclaim, Black's Safe Harbor defense, and Irving's statutory damages. ECF No. 184. The verdict form also asked the jury to decide in their advisory capacity Black's subsection (v) declaratory relief claim and Black's laches defense. *Id.* The verdict form did not ask the jury about Irving's declaratory relief counterclaim because Irving explained at the Final Pretrial Conference that a decision on Irving's ACPA cybersquatting counterclaim would also be dispositive of Irving's declaratory relief counterclaim. ECF No. 149 at 20.

On June 14, 2019, the jury returned a verdict. ECF No. 190. Specifically, as to Black's subsection (v) declaratory relief claim, the jury in their advisory capacity answered "Yes" to the question: "Has Mr. Black proven by a preponderance of the evidence that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act?" *Id.* As to Irving's ACPA cybersquatting counterclaim, the jury answered "No" to the question: "Has Irving Materials, Inc. proven by a preponderance of the evidence that Mr. Black violated the Anti-Cybersquatting

United States District Court
Northern District of California

Consumer Protection Act?" *Id.* Thus, the jury did not need to and did not reach questions regarding Black's Safe Harbor or laches defenses or Irving's statutory damages. *Id.*

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. Pro. 52(a)(1).

## III. CONCLUSIONS OF LAW

In the instant case, the three claims that went to trial were: (1) Irving's ACPA cybersquatting counterclaim; (2) Irving's counterclaim for declaratory relief that Black violated the ACPA (28 U.S.C. § 2201); and (3) Black's subsection (v) declaratory relief claim, which allows Black to obtain injunctive relief enjoining Irving from its efforts to force Black to transfer the imi.com domain name to Irving. The Court discusses each claim in turn.

### A. Irving's ACPA Cybersquatting Counterclaim

Irving's cybersquatting counterclaim was brought pursuant to the ACPA, 15 U.S.C. § 1125(d). The jury found that Irving did not prove its ACPA cybersquatting counterclaim by a preponderance of the evidence. ECF No. 190. Below, the Court discusses the law then explains why the jury's verdict was supported by substantial evidence.

#### 1. The ACPA (15 U.S.C. § 1125(d))

The ACPA establishes civil liability for cybersquatting if Irving proves that (1) Black registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by Irving; (3) Irving's mark was distinctive at the time of Black's registration of the domain name; and (4) Black acted with bad faith intent to profit from that mark. *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1218–19, n.10 (citing 15 U.S.C. § 1125(d)).

As for the first ACPA element, the parties did not dispute that Black registered the imi.com

domain name, and the jury was advised as to that fact in the joint stipulation of facts. JX-1 at 2.

As for the second ACPA element, Black stipulated that the imi.com domain name is identical to Irving Material, Inc.'s IMI trademark, and the jury was so advised. ECF No. 186 at 17.

The third ACPA element requires that Irving's IMI trademark be distinctive at the time of Black's registration of the imi.com domain name in 1994. To find distinctiveness, the mark must first be placed on a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). The latter three categories of marks are deemed inherently distinctive and are entitled to protection because they serve to identify a particular source of a product. *Id.* On the other hand, "[g]eneric marks are not capable of receiving protection because they identify the product, rather than the product's source." *KP Permanent Make-Up, Inc v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

Descriptive marks simply "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005). A descriptive mark receives trademark protection only when it establishes "secondary meaning" in the marketplace. *Id.* Secondary meaning occurs when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (citation and bracket omitted). "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc.*, 505 U.S. at 769.

The fourth ACPA element requires a finding that Black did not act in bad faith. The ACPA lists nine factors to consider in determining whether a person has a bad faith intent to profit from the domain name, including but not limited to: (I) Black's trademark or other intellectual property rights, if any, in the domain name; (II) the extent to which the domain name consists of Black's legal name or a name that is otherwise commonly used to identify Black; (III) Black's prior use, if

any, of the domain name in connection with the bona fide offering of any goods or services; (IV) Black's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) Black's intent to divert consumers from Irving's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) Black's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) Black's provision of material and misleading false contact information when applying for the registration of the domain name, Black's intentional failure to maintain accurate contact information, or Black's prior conduct indicating a pattern of such conduct; (VIII) Black's registration or acquisition of multiple domain names which Black knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in Black's domain name registration is or is not distinctive and famous. 15 U.S.C. § 1125(d)(1)(B).

### 2. Substantial Evidence Supported the Jury's Verdict on Irving's ACPA Cybersquatting Counterclaim

Below the Court discusses why substantial evidence supported a finding that: (1) Irving's IMI trademark was not distinctive at the time of Black's registration of the domain name (element 3 of the ACPA); and (2) Black did not act with a bad faith intent to profit from the domain name (element 4 of the ACPA).

### a. There Was Substantial Evidence That Irving's IMI Trademark Was Not Distinctive

The third ACPA element requires that Irving's IMI trademark be distinctive at the time of Black's registration of the imi.com domain name in 1994.

At trial, the jury heard evidence of Irving's use of IMI beginning in 1962. However, the

Case No. 17-CV-06734-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

jury heard evidence that Irving almost always used the IMI trademark simultaneously with the company's full name: "Irving Materials, Inc." *See* D Ex.1; 6/14/19 Transcript at 585:22–586:12. Moreover, the jury heard evidence that Irving's IMI trademark was not registered until September 19, 1995. 6/11/19 Transcript at 519:5–18; D Ex.11.

The jury also heard from Dr. Wright that in 1994, there were 19 registered IMI trademarks as well as additional unregistered IMI businesses. 6/11/19 Transcript at 430:22–25; BX-17. Dr. Wright further testified that as of 2018, there were 71 live IMI trademark registrations. 6/11/19 Transcript at 431:1–7; BX-17.

The jury also heard that Irving's business was limited to Indiana, the surrounding areas, and the construction industry. 6/14/19 Transcript at 652:9–11. Specifically, Dr. Wright testified about JX-12, which was a study paid for by Irving that shows the limited geographical reach of Irving. JX-12 at 8; 6/11/19 Transcript at 440:7–444:1. The study shows that Irving's "footprint, their marketing, where they sell [their] product, where they market their product, is strictly limited to Indiana and the bordering areas of the states surrounding it." 6/11/19 Transcript at 443:9–14; JX-12 at 8. Dr. Wright also cited another page of the study, which showed that Irving was limited to a number of products: "paving, concrete, and aggregates." 6/11/19 Transcript at 443:15–444:1; JX-12 at 11. Similarly, Black testified at trial that when he registered the mark: "I had no idea who Irving Materials was. I had never been out in Indiana. I've never seen any of their trucks driving here in California. I had no intent at all to profit off of their site." 6/11/19 Transcript at 303:12–304:10.

In addition, Irving did not have a website or online presence in 1994. 6/14/19 Transcript at 636:21–23. Indeed, Irving first put up its website, irvmat.com, in 1996. *Id.* Moreover, Irving shifted its marketing and branding strategy to digital and online advertising sometime between 2014 and 2017. *Id.* at 614:13–616:10, 650:6–653:9; 6/11/19 Transcript at 497:17–503:9.

Finally, although Irving had the burden at trial to prove that its IMI trademark was distinctive at the time of Black's registration of the imi.com domain name in 1994, Irving failed to produce any evidence showing consumer perception of the mark as of 1994, such as consumer

surveys. *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (plaintiff bears the burden to prove distinctiveness); *Self–Realization Fellowship Church v. Ananda*, 59 F.3d 902, 910-12 (9th Cir. 1995) (same); *see also, e.g.*, *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (stating that a consumer survey can provide persuasive evidence of distinctiveness). Irving further failed to produce evidence concerning the effectiveness or reach of its advertising. *See* 6/14/19 Transcript at 735:20–736:3.

The Court finds that the above facts constitute substantial evidence from which a jury could find that Irving's IMI trademark was not distinctive at the time of Black's registration of the imi.com domain name in 1994 (element 3 of the ACPA).

**b. There Was Substantial Evidence That Black Did Not Act with Bad Faith Intent**

Second, substantial evidence supported a finding that Black did not act with bad faith intent to profit from the domain name (element 4 of the ACPA). The Court discusses each of the nine bad faith factors in turn.

**i. Factors I, III, and VI**

Factor I concerns Black's trademark or other intellectual property rights, if any, in the imi.com domain name.

Factor III concerns Black's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services.

Factor VI concerns Black's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct.

Here, the jury heard the following evidence related to these factors. Black owned the imi.com domain name since 1994—for over 25 years at the time of trial—and Black used the imi.com domain name for his companies, including Internet Marketing Inc. and International Monetary Investments LLC. *See, e.g.*, 6/10/19 Transcript at 183:15–184:5, 191:19–23, 197:12–18, 236:20–22; BX-2 (Certificate of Incorporation of Internet Marketing Inc.).

United States District Court
Northern District of California

Black incorporated Internet Marketing Inc. on April 6, 1994. 6/10/19 Transcript at 197:12–18, 236:20–22; BX-2 (Certificate of Incorporation of Internet Marketing Inc.). In 1994, Black used imi.com to create a website that had "Internet Marketing, Inc." across the top of the page. 6/10/19 Transcript at 185:2–6; JX-5 (copy of imi.com from 1998). Internet Marketing, Inc. and imi.com held the data of Black's clients, created internet directories, and built Black's clients' web presence. 6/10/19 Transcript at 188:16–189:16. Specifically, in 1994, Black started building directories and spiders, which Black explained were "some software that [he] would write that would say, 'I want you to go out to every, every machine on the internet, and on your way, keep track of every little machine you bounce to, or routers.'" 6/10/19 Transcript at 184:13–185:1, 201:9–14. Black further explained: "then I reversed that backwards and turned that into the first internet service provider listing in the world that would show how many people were behind each ISP at the time. An ISP is an internet service provider." *Id.* at 184:13–185:1.

Black displayed the IMI mark on his website, documents, around 30 or more non-disclosure agreements, business plans for corporations, presentations and pitch decks. *Id.* at 189:23–190:8, 203:3–17; BX-3 (1994 NDA); BX-4 (Internet Marketing Inc. business records dated 1994). Black shared his IMI mark with companies, including Oracle, Microsoft, Yahoo, Digital Equipment, American Business Information, NW Ayer Incorporated, Excelsior, and Digex. 6/10/19 Transcript at 215:1–8, 216:8–221:14.

Black testified as to Internet Marketing Inc.'s relationships with the above-mentioned companies. For instance, Black explored working with Jerry Yang, the co-founder of Yahoo, to build an online directory of company names on the internet because Yahoo was manually entering information but Black had a method of automatically building databases online using his spiders. *Id.* at 221:11–222:14, 229:2–18. In support of his discussion about Internet Marketing Inc.'s business relationship with Yahoo, Black introduced exhibit BX-5, which is a 1994 email from Jerry Yang to Black, which concludes: "To summarize, we are impressed by the resource and talent pool that IMI has pulled together. We share much of the vision that IMI does, and see a good potential fit. Of concern to us is the relative worth of Yahoo, the amount of resources Yahoo

28

will receive from IMI in the short run and long run, the autonomy of Yahoo (both short and long term), and the pace at which things will be accomplished." BX-5.

Black's company also had a relationship with the Emmy Awards throughout the period of 1994 to 1999, and imi.com hosted a live broadcast of the Emmys through the alias "bigalpha.imi.com." 6/10/19 Transcript at 234:11–236:11.

Black rolled Internet Marketing Inc. into two other entities. *Id.* at 232:11–25. Specifically, Internet Marketing Inc. had started as an S Corp that was tied to Black's social security number, but because venture capitalists would not fund S Corps, Black had to change the corporate form. *Id.* at 232:11–25, 236:13–22. Thus, Internet Marketing Inc. was rolled into a company called iChannel in 1996, which was then later rolled into iAtlas in 1998. *Id.* at 236:15–16; 6/11/19 Transcript at 277:12–16, 312:16–314:4. Black introduced into evidence BX-13, which was a January 24, 2000 letter from the Chestnut Partners Team—the venture capital firm that funded Black's company—regarding the changes. BX-13 stated: "Dear Jeffery, Now that you have changed the Company's name yet again and the original iAtlas (or iChannel, ODS, or IMI) team is scattered across the country, please accept the enclosed as a token to remember the search engine that changed the way people surf the Web. We wish you the best of luck in all of your future successes." BX-13.

In 1999, Black sold iAtlas to AltaVista for $25 million. 6/10/19 Transcript at 237:24–238:15; 6/11/19 Transcript at 277:12–22, 314:5–10; BX-13. This transaction included all of the assets from Internet Marking Inc. going back to 1994, with the exception of the imi.com domain name, which AltaVista allowed Black to keep. 6/11/19 Transcript at 277:12–278:21.

In 2016, Black incorporated his new company, International Monetary Investments LLC. 6/11/19 Transcript at 252:15–23, 294:19–296:24. In December 2016, Black licensed his imi.com domain name to his International Monetary Investments LLC company. *Id.* at 296:25; BX-15 (12/4/16 domain use and license agreement for imi.com and imi.info between Black and International Monetary Investments LLC). International Monetary Investments LLC entered into 300 contracts with clients, and a majority of the agreements were signed in 2016. 6/11/19

Case No. 17-CV-06734-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Transcript at 298:15–301:15. In 2017, Black got an offer from one of his venture capital contacts to invest $10 million in International Monetary Investments LLC. *Id.* at 310:10–311:7. However, that venture capitalist walked away when he found out that Black was accused of cybersquatting. *Id.* As a result, Black lost all of his funding to help service his 300 contracts. *Id.* Black has yet to sell goods or services through International Monetary Investments LLC. However, before March 22, 2018, Black bought a million dollars' worth of product. 6/11/19 Transcript at 354:17–355:11.

Although the jury heard evidence that Black offered imi.com for sale and would not consider offers of less than $2 million, the jury also heard evidence that Black received seven or more other offers for imi.com between 2000-2002, including an offer of $2 million and an offer of $4 million. 6/11/19 Transcript at 284:19–285:16, 286:22–291:16, 374:1–16; 6/14/19 Transcript at 655:8–656:12.

### ii. Factors II and VII

Factor II concerns "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person." 15 U.S.C. § 1125(d)(1)(B). In the final jury instructions, the parties agreed to instruct the jury on Factor II as follows: "the extent to which the domain name consists of Black's legal name or a name that is otherwise commonly used to identify Black." ECF No. 186.

Factor VII concerns Black's provision of material and misleading false contact information when applying for the registration of the domain name, Black's intentional failure to maintain accurate contact information, or Black's prior conduct indicating a pattern of such conduct.

At trial, Irving did not dispute that Black has always provided accurate contact information for the imi.com domain name. *See* ECF No. 83 at 16. Moreover, the jury heard evidence that Black associated his home address, his home phone number, his cell phone number, and his pager with the imi.com domain name from 1994 to 2019. 6/10/19 Transcript at 183:15–184:5, 191:19– 23. In fact, Jerry Howard, Irving's Vice President of IT and former Director of IT, testified that he located Black through WHOIS because Black's contact information was accurate. 6/11/19 Transcript at 405:1–11. In addition, the jury heard evidence that Black's companies, Internet

Marketing Inc. and International Monetary Investments LLC, have the initials "IMI," and used imi.com. *See, e.g.*, 6/10/19 Transcript at 189:23–190:8, 203:3–17, 215:1–8, 216:8–221:14; BX-3 (1994 NDA); BX-4 (Internet Marketing Inc. business records dated 1994).

### iii. Factor IV

Factor IV concerns Black's bona fide noncommercial or fair use of the mark in a site accessible under the domain name. Here, the jury heard that Black used imi.com as a directory website beginning in 2002 and that he never charged any of the companies that he listed nor made money from the directory website. 6/11/19 Transcript at 281:9–284:7; JX-7 (screenshot of imi.com from 2002 showing directory of companies with IMI name).

### iv. Factor V

Factor V concerns Black's intent to divert consumers from Irving's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

Here, the jury heard the following evidence as to this factor. When Black registered imi.com, he was not aware of Irving: "I had no idea who Irving Materials was. I had never been out in Indiana. I've never seen any of their trucks driving here in California. I had no intent at all to profit off of their site." 6/11/19 Transcript at 303:12–304:10.

Moreover, in 1994, Irving did not have a website. 6/14/19 Transcript at 636:21–23. Irving's website is irvmat.com. *Id.* Irving first put up its website in 1996. *Id.*

Further, Black had no intent to divert consumers from Irving's website to Black's website. Instead, in 2002, when Black put imi.com back up, Black included a free directory on imi.com for companies with the IMI name. 6/11/19 Transcript at 282:11–284:7. Black created the directory using the names of companies that had reached out to Black to purchase the imi.com domain name, including Irving. *Id.* Black explained that Black was not trying to profit from these companies, but rather was redirecting to these companies' websites any traffic that came to imi.com but was intended for these companies. *Id.* One company requested to be removed from

Case No. 17-CV-06734-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

the directory, and one company requested to be added. *Id.* Black complied with both requests. *Id.*

Black testified that Black had no reason to believe what Black was doing was illegal. 6/11/19 Transcript at 286:11–23, 306:15–20. Black testified he received approval from his attorneys with regards to his actions involving Internet Marketing Inc. *Id.* Black also received the United States Treasury Department's approval of contracts that Black entered into through International Monetary Investments LLC. *Id.*

Finally, although Jeffrey McPherson, Irving's Vice President of Sales and Marketing, testified that three of Irving's 20,000 customers may have been confused by the presence of imi.com, Jerry Howard, Irving's Vice President of IT and former Director of IT, testified that no confusion about the imi.com website was reported to Irving. 6/14/19 Transcript at 624:14–625:10.

### v. Factor VIII

Factor VIII concerns Black's registration or acquisition of multiple domain names which Black knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties.

Here, Black had successfully registered and sold several domain names, including resorts.com in 1999 for $950,000 and hotels.com in 2001 for $11 million. 6/10/19 Transcript at 195:8–21. For hotels.com, Black built a booking reservation system complete with maps, and hand coded over 40,000 hotels into the database. *Id.* at 193:18–194:15. Black owned several other domain names, including hiking, biking, scuba, tennis, and recreation domain names. *Id.* at 195:22–197:11. Black gave these domain names away for free. *Id.* Black further testified that business.com, a domain name for which Black had no involvement, sold sometime between 2000-2002 for $7 million. 6/11/19 Transcript at 375:23–376:3.

### vi. Factor IX

Factor IX concerns the extent to which the mark incorporated in Black's domain name registration is or is not distinctive and famous. Here, as already discussed above, the jury heard substantial evidence to find that Irving's IMI trademark was not distinctive at the time of Black's registration of the imi.com domain name in 1994. *See* Section III.A.2.a. Moreover, Irving never

32

asserted that its mark was famous in 1994 or at any time. *See* ECF No. 122 at 55 ("Irving Materials, Inc. has not and does not intent to assert that its registered trademark was famous.").

Thus, considering all of the evidence and the bad faith factors, the Court finds that substantial evidence supported a finding that Black did not act with a bad faith intent to profit from the domain name (element 4 of the ACPA).

### c. Summary of Irving's ACPA Cybersquatting Claim

In summary, substantial evidence supported a finding that Irving's IMI trademark was not distinctive at the time of Black's registration of the imi.com domain name in 1994 (element 3 of the ACPA) and that Black did not act with bad faith intent to profit from the domain name (element 4 of the ACPA). Thus, the Court finds that the jury's verdict that Irving did not prove its ACPA cybersquatting counterclaim by a preponderance of the evidence was supported by substantial evidence.

### B. Irving's Declaratory Relief Counterclaim

Irving also asserted a declaratory relief counterclaim that seeks a declaration that Black violated the ACPA (28 U.S.C. § 2201). Irving's declaratory relief counterclaim survived summary judgment and proceeded to trial. However, the verdict form did not contain a specific question on Irving's declaratory relief counterclaim because Irving agreed at the Final Pretrial Conference that a decision on its ACPA cybersquatting counterclaim would also be dispositive of Irving's declaratory relief counterclaim that Black violated the ACPA. ECF No. 149 at 20. Therefore, the jury did not render a verdict on the declaratory relief counterclaim, and the Court must resolve this counterclaim.

Because the jury found that Irving did not prove its ACPA cybersquatting counterclaim by a preponderance of the evidence, and because Irving conceded that a decision on its ACPA cybersquatting counterclaim was also dispositive of its declaratory relief counterclaim that Black violated the ACPA, the Court finds that Irving has also failed to prove by a preponderance of the evidence its declaratory relief counterclaim. Thus, the Court rules in Black's favor on Irving's declaratory relief counterclaim that seeks a declaration that Black violated the ACPA.

United States District Court
Northern District of California

### C. Black's Subsection (v) Declaratory Relief Claim

The jury rendered a verdict in its advisory capacity as to Black's subsection (v) declaratory relief claim. ECF No. 190. Specifically, the jury answered "Yes" to the question: "Has Mr. Black proven by a preponderance of the evidence that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act?" *Id.* Because the jury rendered the verdict as to Black's subsection (v) declaratory relief claim only in the jury's advisory capacity, pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court must find facts and state its conclusions of law separately as to this claim. Thus below, the Court first explains the law and then analyzes whether Black has proven his subsection (v) declaratory relief claim.

15 U.S.C. § 1114(2)(D)(v) provides:

> (v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(v). Thus, in order for Black to prevail on his subsection (v) declaratory relief claim, Black must prove by a preponderance of the evidence that (1) Black is a domain name registrant; (2) Black's domain name was suspended, disabled, or transferred due to Irving's complaint; and (3) Black's registration or use of the domain name has not been unlawful. *Id.*

For the following reasons, the Court finds that Black has proven his subsection (v) declaratory relief by a preponderance of the evidence.

First, Black had to prove by a preponderance of the evidence that he is a domain name registrant. Black registered the imi.com domain name in 1994, and Black has owned imi.com ever since. 6/10/19 Transcript at 183:15–184:5, 191:19–23; JX-1. Thus, the Court finds that Black has proven that he is a domain name registrant.

Second, Black had to prove by a preponderance of the evidence that his domain name was suspended, disabled, or transferred due to Irving's complaint. After Irving initiated its UDRP proceeding complaint against Black in 2017, Black's imi.com domain name was suspended.

34

6/10/19 Transcript at 252:7–19; 6/11/19 Transcript at 301:14–21. Specifically, Black testified: "all of a sudden, I couldn't do anything because when [Irving] filed a complaint, it turns out there's some crazy rule that when you file a complaint, somebody gets to freeze your DNS, they get to freeze your website, they get to freeze everything." 6/10/19 Transcript at 252:23–253:2; 6/11/19 Transcript at 301:22–302:1. Black testified that this adversely affected him. At the time, Black was repurposing imi.com to use for International Monetary Investments LLC and was going through due diligence to get venture capital funding for International Monetary Investments LLC. *Id.* at 252:15–23. In 2017, Black got an offer from one of his venture capital contacts to invest $10 million in International Monetary Investments LLC. *Id.* at 310:23–311:7. However, that venture capitalist walked away when he found out that Black was accused of cybersquatting. *Id.* As a result, Black has lost all of his funding to help service his 300 contracts. *Id.* Thus, the Court finds that Black has proven that Black's imi.com domain name was suspended due to Irving's UDRP complaint.

Third, Black had to prove by a preponderance of the evidence that Black's registration or use of the domain name has not been unlawful. Here, the Court finds that Black has proven that Black's use of the domain name has not been unlawful. As discussed above, the jury found by a preponderance of the evidence that Black did not violate the ACPA. In Section III.A.2, the Court found the jury's verdict was supported by substantial evidence, including substantial evidence that Irving's IMI trademark was not distinctive at the time of Black's registration of the imi.com domain name in 1994 and that Black did not act with bad faith intent to profit from the domain name. *See* Section III.A.2. Thus, the for all of the reasons discussed in Section III.A.2., the Court finds that Black has proven that his registration or use of imi.com has not been unlawful.

Further, the Court reiterates that Black testified that he believed all of his actions were lawful. 6/11/19 Transcript at 286:11–23, 306:15–20. Black testified he received approval from his attorneys with regards to his actions involving Internet Marketing Inc. *Id.* Black also testified that he received the United States Treasury Department's approval of contracts that Black entered into through International Monetary Investments LLC. *Id.*

35

United States District Court
Northern District of California

1    Accordingly, the Court finds that Black has proven by a preponderance of the evidence his

2  subsection (v) declaratory relief claim. Thus, the Court enjoins Irving from its efforts to force

3  Black to transfer the imi.com domain name to Irving.

4  **IV.      CONCLUSION**

5    For the foregoing reasons, the Court finds that the jury's verdict that found that Irving did

6  not prove its ACPA cybersquatting counterclaim by a preponderance of the evidence was

7  supported by substantial evidence. The Court also finds that Irving did not prove by a

8  preponderance of the evidence its counterclaim for declaratory relief that Black violated the

9  ACPA.

10    The Court finds that Black proved by a preponderance of the evidence Black's declaratory

11  relief claim that Black lacked bad faith intent and thus did not violate the ACPA. Therefore, Irving

12  is hereby enjoined from its efforts to force Black to transfer the imi.com domain name to Irving.

13  **IT IS SO ORDERED.**

15  Dated: August 10, 2019

16  _Lucy H. Koh_
                                                    _____
17                                                  LUCY H. KOH
                                                    United States District Judge