Michael L. Rodenbaugh
California Bar No. 179059
Marie E. Richmond
California Bar No. 292962
RODENBAUGH LAW
25435 Hutchinson Road
Los Gatos, CA 95033
(415) 738-8087

Attorneys for Jeffery Dean Black

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY DEAN BLACK,<br><br>        Plaintiff,<br>vs.<br><br>IRVING MATERIALS, INC.,<br><br>        Defendant.<br><br>IRVING MATERIALS, INC.,<br><br>        Counter-Claimant,<br>vs.<br><br>JEFFERY DEAN BLACK,<br><br>        Counter-Defendant. | Case No. 5:17-cv-06734-LHK<br><br>**JEFFERY DEAN BLACK'S MOTION FOR ATTORNEYS' FEES; POINTS & AUTHORITIES IN SUPPORT THEREOF [15 U.S.C. § 1117(a); L.R. 54-5]**<br><br>**Date: December 19, 2019**<br>**Time: 1:30 p.m.**<br>**Courtroom: 8**<br><br>**Hon. Lucy Koh** |

**NOTICE OF MOTION FOR ATTORNEYS' FEES**

TO DEFENDANT AND COUNTERCLAIMANT AND ITS ATTORNEYS OF RECORD, notice is hereby given that on December 19, 2019, in Courtroom 8, Plaintiff and Counterdefendant Jeffery Dean Black ("Plaintiff") will respectfully move that this honorable Court grant an award of reasonable attorneys' fees in its favor pursuant to 15 U.S.C. § 1117(a), and Civil L.R. 54-5.

**TABLE OF CONTENTS**

1. INTRODUCTION; FACTUAL BACKGROUND……………………….5

2. ARGUMENT…………………………………………………………….7

    a. **In This Exceptional Case, Mr. Black is Entitled to Recover His Reasonable Attorneys' Fees as the Prevailing Party**………..7

        i. Irving's Cybersquatting Claim Was Objectively Baseless as to Both Elements……………………………...9

        ii. Irving's Motivation Was Foul -- Neither Consumers Nor Irving Were Harmed………………………………....11

        iii. The ACPA's RDNH Provisions Were Designed to Deter Such Abuse…………………………………………….12

        iv. Reasonableness of Fees…………………………………14

3. CONCLUSION………………………………………………………….15

# TABLE OF AUTHORITIES

**Supreme Court**

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994)..................................................................................7-8

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)...............................................................................7, 8

**Circuit Courts**

*Barcelona.com, Inc. v. Excelentisimo Ayun. de Barcelona*,
    330 F.3d 617 (4th Cir. 2003).....................................................................11, 12

*Domond v. PeopleNetwork APS*,
    750 Fed.Appx. 844 (11th Cir. 2018)........................................................13

*Globefill Inc. v. Elements Spirits, Inc.*,
    640 Fed.Appx. 682 (9th Cir. 2016)..........................................................11

*Jordan v. Multnomah Cnty.*,
    815 F.2d 1258 (9th Cir. 1987)..................................................................15

*Lahoti v. Vericheck, Inc.*,
    636 F.3d 501 (9th Cir. 2011)....................................................................7

*Sallen v. Corinthians Licenciamentos LTDA*,
    273 F.3d 14 (1st Cir. 2001).......................................................................12-13

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
    839 F.3d 1179 (9th Cir. 2016)..................................................................8

**District Courts**

*AirFX.com v. AirFX, LLC*,
    2013 WL 857976 (D. Ariz. Mar. 7, 2013)...............................................7, 10, 13-14

*Amusement Art*,
    2017 WL 2259672 (C.D. Cal. May 23, 2017)........................................15

*Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*,
    2018 WL 6186798 (D. Idaho Nov. 27, 2018).........................................10

*Sazerac Co., Inc.,. v. Fetzer Vineyards, Inc.*,
    2017 WL 6059271 (N.D. Cal. Dec. 7, 2017)..........................................8, 11, 14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1. INTRODUCTION; FACTUAL BACKGROUND**

This entire case is the result of Irving Materials' abusive effort to hijack the <imi.com> domain name. Irving decided to wrongfully accuse Mr. Black of bad faith cybersquatting, in effort to bully Mr. Black into handing over his rightful property -- solely because Irving wanted a domain name three letters shorter than the one they have used since 1996.

In 1998, they tried to scare Mr. Black into giving it to them for $500. They threatened a federal lawsuit that they now admit had no merit, as there was no cognizable confusion nor harm to Irving at that time, or ever. They then did nothing for nineteen years, until 2017 when they filed a UDRP complaint, without even bothering to try to contact Mr. Black first. The only reason they cite for coming after the name again is Mr. McPherson's promotion and the hiring of an online marketing firm; in other words, because they wanted the name for themselves "to make sure our brand is consistent". (Findings, p.11-12; 6/11/19 Tr. at 504:7-23.) Mr. Howard admitted that no confusion was ever reported to Irving. (Findings, p.12; 6/14/19 Tr. at 624:14-625:10.) No Irving witness could point to <u>any</u> legally cognizable harm that has <u>ever</u> occurred as a result of Mr. Black's use of his property.

Yet, Irving has caused significant harm to Mr. Black and to his International Monetary Investments business formed in 2016. Upon Irving's filing of its UDRP complaint in 2017, Mr. Black's domain registration was frozen per the procedural rules of the UDRP, such that he could not make changes to his website. (Findings, p.13; 6/10/19 Tr. at 252:23–253:2; 6/11/19 Tr. at 301:22–302:1.) Freezing of the domain was thus an automatic consequence of the UDRP filing, and certainly Irving and its counsel knew or should have known that would happen. Moreover, the filing of the complaint, accusing Mr. Black of cybersquatting, caused a venture capitalist to withdraw $10 million in funding for his business. (Findings, p.13; 6/11/19 Transcript at 310:10–311:7.) Loss of the investment was foreseeable, and would have been known if Irving's counsel had engaged in even minimal pre-filing diligence whatsoever, such as contacting Mr.

Black before publicly shaming him as an alleged cybersquatter -- and costing him a lot of money to pay reasonable attorneys' fees.

It is highly unusual to file a UDRP or any other trademark complaint without contacting the defendant first in an effort to gain voluntary compliance; *i.e.*, a "cease and desist" notice. But Irving didn't bother to even try, instead they just filed a reckless complaint and let the chips fall where they may -- causing significant and wholly unjustified harm to Mr. Black and his business. And all for what? Irving produced zero evidence of any harm to itself or its customers -- it just wanted a "more consistent" online brand experience.

Irving did not come close to proving that it owned a distinctive mark in 1994, as it was clearly required to do by the plain language of the cybersquatting statute. As the Court held: "Irving failed to produce any evidence showing consumer perception of the mark as of 1994, such as consumer surveys…. Irving further failed to produce evidence concerning the effectiveness or reach of its advertising." (Findings, p.27 (citations omitted).) Thus, Irving wholly failed to prove the first substantial element of its claim.

Irving also failed to prove that <u>any</u> of the nine factors of the ACPA "bad faith" analysis weighed in its favor. (Findings, p.27-33.) Irving's sole evidence of bad faith was the "for sale" page that Mr. Black posted behind the imi.com directory from 2002 to 2017. (Findings, p.15.) But that could not serve as evidence of bad faith under the ACPA, as it was clear that the domain name previously had been used in the *bona fide* offering of services. (*See* Findings, p.25 (factor VI).) That was clear from Irving's discussion with Mr. Black in 1998. (*See* Findings, p.7; 6/10/19 Tr. 242:2-243:7 (Black to Howard: "My business is called Internet Marketing, Inc. It's still running….); BX-12 (memo outlining switching costs, discussed with Irving).) That was further proved by Irving's knowledge that Internet Marketing, Inc. was an incorporated business with a live public website and email addresses at imi.com. Indeed, and so that entity was named as a defendant in the draft federal lawsuit sent by Irving's lawyers in 1998. (JX-6.)

Thus, Irving did not come close to proving either of the substantive elements of its ACPA counterclaim. Instead, Irving admitted that its sole purpose was <u>not</u> to alleviate consumer

confusion as the Lanham Act is intended to do, but instead to take Mr. Black's property through legal process in order to use it in Irving's business "to make sure our brand is consistent". (Findings, p.11; 6/11/19 Tr. at 503:24-504:6.) Such motivation is not legitimate, by any stretch of the imagination. Irving has caused grievous harm to Mr. Black. Mr. Black deserves to be compensated for his reasonable attorneys' fees in beating back Irving's illegitimate crusade to steal Mr. Black's property. Such an award will certainly deter Irving from any such future conduct, and also would serve as a stark deterrent to other overreaching, abusive trademark owners. That was precisely the intent of the 'reverse domain name hijacking' provisions of the ACPA.

2. **ARGUMENT**

   a. **In This Exceptional Case, Mr. Black is Entitled to Recover His Reasonable Attorneys' Fees as the Prevailing Party.**

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Ninth Circuit has held that fees for claims brought under the ACPA are recoverable under this Section. *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 510 (9th Cir. 2011) (affirming fee award); *cited in, AirFX.com v. AirFX, LLC*, 2013 WL 857976 at *3 (D. Ariz. Mar. 7, 2013) (finding cybersquatting counterclaim "groundless and unreasonable", even after counterclaimant had won UDRP decision, and thus awarding fees under Section 1117(a) -- "It was unreasonable for defendant to pursue its ACPA counterclaim once it discovered that theairfx.com was originally registered before the AirFX mark.").

In 2014, the Supreme Court interpreted the "exceptional case" language to mean a "[case] that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). The Supreme Court further elaborated that "there is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the considerations we have identified." *Id.* (*quoting Fogerty v. Fantasy, Inc.*, 510 U.S.

517, 534 (1994) (internal quotations omitted).  The Supreme Court additionally identified a number of factors that may be analyzed in determining whether a case is "exceptional" -- including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at n.6. (*quoting Fogerty*, 510 U.S. at 534).

While the *Octane Fitness* case specifically dealt with the award of fees in a patent dispute, the Ninth Circuit has adopted the holding to apply to the fee-shifting provision of the Lanham Act.  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180–81 (9th Cir. 2016) (*en banc*).  The Ninth Circuit held that "district courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case [is] exceptional, exercising equitable discretion in light of the nonexclusive factors identified in *Octane Fitness* and *Fogerty*, and using a preponderance of the evidence standard."  *Id.*

As Judge Orrick has held:

> *Octane Fitness* changed the standard and that change entails a "more relaxed" approach. *See SunEarth*, 839 F.3d 1179, 1181 ("*Octane Fitness* and *Highmark* have *altered the analysis* of fee applications under the Lanham Act") (emphasis added); *Amusement Art, LLC v. Life is Beautiful, LLC*, 2017 WL 2259672, at *3 (C.D. Cal. May 23, 2017) (referring to *Octane Fitness* as a "more relaxed standard[ ]"); *ThermoLife Int'l, LLC v. Myogenix Corp.*, 2017 WL 1235766, at *3 (S.D. Cal. Apr. 4, 2017) ("Under the new analysis, a case may warrant a fee award if the litigation is brought in subjective bad faith, <u>or</u> if the litigation is objectively baseless—both are no longer required.") (emphasis in original).

*Sazerac Co., Inc.,. v. Fetzer Vineyards, Inc.*, 2017 WL 6059271 at *4 (N.D. Cal. Dec. 7, 2017) (awarding fees as Plaintiff failed to prove trademark distinctiveness or any irreparable harm).

Finally, "[o]nce a prevailing party establishes its right to recover fees, the district court must determine whether the amount requested is reasonable."  *E.g., Sazerac Co.,* 2017 WL 6059271 at *3.  Local Rule 54-5 sets forth the evidentiary support required for this motion, included in the Declaration of Mike Rodenbaugh, filed herewith.  That includes a summary of the work performed in this case by Mr. Black's attorneys, their experience and their billing rates which are certainly reasonable in this District.  Complete Rodenbaugh Law time records can be

provided *in camera* at the Court's request. Notably, Mr. Black's attorneys' billing rates are far lower than opposing counsel's billing rates. (*See* Dkt #47-2, p.5, stating Ms. Wirtschafter's rate of $545/hr. -- higher than Mr. Rodenbaugh's rate, though he has 18 more years experience.) Undoubtedly, total billings to Mr. Black in this case are far, far lower than those charged to Irving by Reed Smith, and thus should be deemed reasonable given that Mr. Black prevailed on all claims at trial.

        i.     **Irving's Cybersquatting Claim Was Objectively Baseless as to Both Elements**

As stated, Irving did not come close to proving its trademark was distinctive in 1994, as it produced no evidence of consumer perception or of the effectiveness of its advertising as of that time. (Findings, p.27.) Moreover, Irving failed to prove that <u>any</u> of the nine denominated ACPA cybersquatting factors weighed in its favor. (*Id.*, p.27-33.) Irving only produced purported "bad faith" evidence as to Mr. Black's "for sale" page published in 2002. (*Id.*, p.15.)

But Irving could never explain how it could be bad faith for Mr. Black to offer his own property for sale, at any price he chooses. Very specifically, the ACPA (factor VI) only considers such evidence in the <u>absence</u> of prior legitimate use of the domain, which was clearly evident to Irving in 1998. Irving knew Mr. Black had incorporated Internet Marketing, Inc. at the same time he registered the domain name. Irving knew Mr. Black used the domain name for a public facing website and for email, at minimum. Irving indeed threatened to sue Mr. Black and Internet Marketing, Inc. in 1998, due to alleged confusion caused by the public facing website. Only 20+ years later, under oath at trial, did Irving admit that it had no evidence of any cognizable consumer confusion or of any cognizable harm to Irving -- either then, or ever.

Irving's ACPA counterclaim should never have been brought, as Irving had almost no evidence to support it. Instead, Irving knew the domain had been used for legitimate purposes, that there was no confusion caused by Mr. Black's use of it, and thus that there was no legally cognizable harm to Irving. Irving also had no legitimate excuse for waiting 19 years from its draft federal complaint to its UDRP complaint, nor for refusing to even try to reach Mr. Black

again before filing the UDRP. Had they reached him, they would have learned about his new company that he had formed the prior year, and was then actively in business as International Monetary Investments LLC -- clearly another legitimate use of the domain.

But instead, they filed a complaint against him without prior notice, and forced Mr. Black to file this lawsuit to preserve his property rights. Instead of giving up at that point, Irving litigated this matter to the hilt, all the way through trial, even with almost no evidence to support its counterclaim.

Courts have found such cases to be exceptional under the ACPA and the Lanham Act. For example, in a highly analogous case, it was held with respect to the winner of a UDRP decision faced with a countersuit like this one: "It was unreasonable for defendant to pursue its ACPA counterclaim once it discovered that theairfx.com was originally registered before the AirFX mark." *AirFX.com*, 2013 WL 857976 at *3 (D. Ariz. Mar. 7, 2013) (awarding fees under Section 1117(a)); *see also*, *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, 2018 WL 6186798, at *3 (D. Idaho Nov. 27, 2018):

> A federal lawsuit is an extreme and formal remedy and NRCC's actions here are classic "making a mountain out of molehill" behavior. The output in time and expense in litigation far outweighs any detriment NRCC suffered—which turned out to be zero. These facts weigh heavily in favor of an award of attorney fees. *See e.g., Amusement Art, LLC v. Life is Beautiful, LLC*, 2017 WL 2259672, at *4 (C.D. Cal. May 23, 2017) (awarding attorney fees to prevailing party when "almost no evidence" was presented to create a triable issue under the Lanham Act).

The *Nelson-Ricks* case is analogous as it involved use of the plaintiff's mark on a website, which was removed upon plaintiff's notice. Yet plaintiff still sued. In this case, Irving did not even provide any notice of alleged infringement, but the evidence was undisputed that Mr. Black would have removed Irving from the imi.com directory if only Irving had asked. (Findings, p.9-10; 6/11/19 Tr. at 282:11–284:7.) That would have eliminated any confusion, if any there was. But of course, Irving admitted there was no such confusion anyway, ever. (Findings, p.12; 6/14/19 Tr. at 624:14-625:10.)

Judge Orrick also found an exceptional case, analogously, where the trademark owner failed to prove distinctiveness and failed to prove any harm -- even though plaintiff's claims had survived summary judgment. *Sazerac*, 2017 WL 6059271 at *8 (holding that plaintiff at trial "essentially relied on the meager disputed facts that enabled it to survive summary judgment on distinctiveness and likelihood of confusion"). He distinguished a Ninth Circuit case affirming denial of fees because the plaintiff in that case "presented compelling evidence relevant to many of the *Sleekcraft* factors." *Id.* at *6 (*quoting, Globefill Inc. v. Elements Spirits, Inc.*, 640 Fed.Appx. 682 (9th Cir. 2016)). In both *Sazerac* and this case, the purported trademark owner provided <u>no</u> compelling evidence of distinctiveness, nor of <u>any</u> of the 8 or 9 liability factors enumerated in the law. In this case, as in that case and the others cited herein, the court should award fees to Mr. Black as the prevailing party on a claim that should never have been brought, in a lawsuit that never should have happened.

### ii. Irving's Motivation Was Foul -- Neither Consumers Nor Irving Were Harmed

It is hornbook law that the Lanham Act was designed to prevent <u>consumer confusion</u> among similar trademarks in related industries. Similarly, the ACPA was designed as an effort to modernize the Lanham Act with respect to domain names, with the purpose to prevent consumer confusion between trademarks and similar domain names.

> The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as "cybersquatting."

S. Rep. No. 106–140, at 4 (1999) (*quoted in, e.g. Barcelona.com, Inc. v. Excelentisimo Ayun. de Barcelona*, 330 F.3d 617, 623 (4th Cir. 2003)).[1] These laws were not intended for the use put to

---

[1] The court continued, relevant to Mr. Black's remaining counterclaim on which he prevailed:

> And to balance the rights given to trademark owners against cybersquatters, the ACPA also provides some protection to domain name registrants against "overreaching trademark owners." S.Rep. No. 106–140, at 11; *see also* 15 U.S.C. § 1114(2)(D)(iv)-(v). Thus, §

them by Irving and other trademark bullies, as a hammer to beat down legitimate business owners in unrelated industries.

As set forth above, Irving offered no compelling evidence that its mark was distinctive in 1994, and admitted there was never any consumer confusion or other cognizable harm caused by Mr. Black's use of his domain name property.  Instead, Irving admitted that its motivation was solely and simply "to make sure our brand is consistent". (Findings, p.11.)  After conducting business offline as Irving Materials, Inc. (aka IMI) for fifty years, then also online at irvmat.com for twenty more years, Irving's marketing people decided they wanted IMI.com -- that it would make their brand "consistent".  They produced no evidence of how such alleged "inconsistency" caused any cognizable confusion or harm to anyone, even Irving.  They had no justification to try to steal Mr. Black's property through legal action, solely for their own selfish business desires.

This case is exceptional not only because it was baseless and supported by no compelling evidence, but also because of Irving's illegitimate motivation which the statute was clearly designed to deter.

### iii. The ACPA's RDNH Provisions Were Designed to Deter Such Abuse

Of course, the purpose of the reverse domain name hijacking (RDNH) protections built into the ACPA is to deter this sort of abusive conduct.  While subsection (iv) automatically provides for attorney fee recovery in the event of an affirmative misrepresentation by the trademark owner, subsection (v) of the statute was also designed to protect registrants like Mr. Black from overreaching trademark owners like Irving, even where the trademark owner did not affirmatively lie about its rights.  *See, e.g., Barcelona.com, supra* n.1; *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 29 (1st Cir. 2001):

> 1114(2)(D)(v) authorizes a domain name registrant to sue trademark owners for "reverse domain name hijacking." [n.1] If a domain-name registrant cybersquats in violation of the ACPA, he "hijacks" the domain name from a trademark owner who ordinarily would be expected to have the right to use the domain name involving his trademark. But when a trademark owner overreaches in exercising rights under the ACPA, he "reverse hijacks" the domain name from the domain-name registrant. Thus, § 1114(2)(D)(v), enacted to protect domain-name registrants against overreaching trademark owners, may be referred to as the "reverse domain name hijacking" provision.

>Viewed in context, and with the structure of the statute in mind, subsection (D)(v) is best understood to provide domain name holders with a cause of action to rectify reverse domain name hijacking by trademark holders using the UDRP process to require registrants to transfer domain names originally held by rightful users under U.S. law.

As the first Circuit stated back in 2001, subsection (v) "is best understood as creating a protection for registrants to counteract abusive behavior by trademark holders." *Id.* ("And this abusive behavior is best understood to include administrative dispute resolution proceedings under the UDRP where those proceedings are intended ... to strip a domain name from a registrant who has lawfully registered and used that domain name.")

Subsection (v) certainly does <u>not</u> preclude any award of fees under Section 1117(a), if the award is within the court's sound discretion. As the prevailing party on that claim (as well as on Irving's cybersquatting claim), Mr. Black should be awarded his reasonable attorneys' fees in this case. The case is exceptional not only because it was baseless and supported by no compelling evidence, but also because of Irving's illegitimate motivation which the statute was clearly designed to deter.

Indeed, the fact that there are so few RDNH cases, in itself, indicates that this case is exceptional. Prior to the judgment in this case, there appear to be exactly <u>only six</u> case opinions reported on Westlaw that have found RDNH, <u>ever</u>, under either subsection (iv) or (v) of the ACPA.[2] In the only <u>two</u> other cases that have issued final judgments to the domain name owner under subsection (v), the courts have granted attorneys' fees under Section 1117(a). *Domond v. PeopleNetwork APS*, 750 Fed.Appx. 844, 847 (11th Cir. 2018) (affirming award); *AirFX,* 2013

---

[2] Subsection (v): *Domond v. PeopleNetwork APS*, 750 Fed.Appx. 844, 847 (11th Cir. 2018) (affirming fee award); *AirFX,* 2013 WL 857976 at *3 (D. Ariz. Mar. 7, 2013) (awarding fees); *Marchex Sales, Inc. v. Tecnologia Bancaria, S.A.,* 2015 WL 3793731 (E.D. Va. June 15, 2015) (magistrate recommendation for default judgment of RDNH; no subsequent history); *Barcelona.com,* 330 F.3d at 630 (reversing District Court finding of no RDNH under (v); no subsequent history).

Subsection (iv): *Walter v. Ville de Paris,* 2012 WL 6934851 (S.D. Tex. Sep. 14, 2012) (awarding fees); *GoForIt Ent., LLC v. DigiMedia.com L.P.,* 2011 WL 2516163 (N.D. Tex. 2011) (awarding fees).

WL 857976 at *3 (D. Ariz., Mar. 7, 2013). They each may be distinguishable to some extent, but the general point is clear.

The ACPA was enacted in year 2000. Six cases in 18+ years is, obviously, very **extremely** rare. These cases are so rare because so few trademark owners would overreach so dramatically and to such an extent -- all the way to the point of adverse judgment in federal court, where they could be ordered to pay the domain owner's reasonable attorneys' fees, in the court's sole discretion. Those extremely few trademark owners that wrongly make cybersquatting claims without sufficient evidence -- and/or with foul motivation unrelated to the purposes of the ACPA or Lanham Act -- are very clearly exceptional, they have clearly <u>abused</u> their trademark rights. They made a calculated gamble and lost, causing grievous harm along the way.

Irving has caused exceptional, proven harm to Mr. Black through its abusive use of the UDRP and ACPA, with almost no evidence to support its cybersquatting claim. Mr. Black has personally suffered enormous time and expense of his own, initially filing *pro se* as he had only ten days to do so per the terms of the UDRP, and subsequently retaining and working with his lawyers through 20 months of federal litigation (and counting). Irving also has caused severe financial loss to Mr. Black, not only from his reasonable attorneys' fees and costs of this action, but also because he lost a $10 million investment in his new business once Irving publicly called him a cybersquatter (with almost no evidence). Therefore, Irving should suffer the requisite consequences as intended by the Lanham Act and the ACPA, and should be ordered to pay Mr. Black's reasonable attorneys' fees in this case.

### iv.    Reasonableness of Fees

Reasonable fees under the Lanham Act are calculated using the Lodestar method, multiplying the reasonable hours expended on the case by a reasonable hourly rate. *See, e.g., Sazerac Co.*, 2017 WL 6059271 at *11 (N.D. Cal. Dec. 7, 2017). Such Lodestar amount is considered "presumptively reasonable". *Id.* Once a party submits evidence of the actual fees incurred, it is the responsibility of the opposing party to challenge the fee amount on any bases of accuracy, reasonableness, or factual dispute, if any. *Id.* The Court may decide that a reduction

from the Lodestar may be appropriate, based on such factors. However, adjustments of the lodestar are "proper only in 'rare' and 'exceptional' cases, supported by specific evidence on the record and detailed findings by the district court." *E.g., Amusement Art*, 2017 WL 2259672, at *5 (C.D. Cal. May 23, 2017), *aff'd in relevant part*, 768 F. App'x 683 (9th Cir. 2019) (*quoting, Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1262 (9th Cir. 1987)).

Local Rule 54-5 sets forth the evidentiary support required for this motion, included in the Declaration of Mike Rodenbaugh, filed herewith. That includes a summary of the work performed in this case by Mr. Black's attorneys, their relevant professional experience, and their billing rates which are certainly reasonable in this District. (Complete Rodenbaugh Law time records can be provided *in camera,* at the Court's request.) Notably, Mr. Black's attorneys' billing rates are <u>far</u> lower than opposing counsel's billing rates. (*See* Dkt #47-2, p.5, stating Ms. Wirtschafter's rate of $545/hr. -- higher than Mr. Rodenbaugh's rate, though he has 18 more years experience.) Undoubtedly, total billings to Mr. Black in this case are far, far lower than those charged to Irving by its counsel, and thus should be deemed reasonable given that Mr. Black prevailed on all claims at trial.

### 3. CONCLUSION

For all of the foregoing reasons, the Court should order that Irving pay Mr. Black's reasonable attorneys' fees in this matter. By a preponderance of the evidence, Mr. Black has proved that Irving abused its trademark rights by prosecuting its ACPA counterclaim in an objectively baseless manner, with foul and selfish intent despite suffering no evident or legally cognizable harm. Such conduct is extremely rare and should be deterred, and Mr. Black should be compensated to the extent allowed by law.

DATED: August 23, 2019                                                  Respectfully submitted,

                                                                  /s/ *Mike Rodenbaugh*
Michael L. Rodenbaugh
California Bar No. 179059
RODENBAUGH LAW
548 Market Street, Box No. 55819
San Francisco, CA 94104

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

By: /s/ *Marie Richmond*
Marie Richmond
RODENBAUGH LAW
584 Market Street
Box 55819
San Francisco, CA 94014
Tel/fax: (415) 738-8087