UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JEFFERY DEAN BLACK, | Case No. 17-CV-06734-LHK |
| Plaintiff, | **ORDER DENYING JEFFERY DEAN BLACK'S MOTION FOR ATTORNEY'S FEES** |
| v. | |
| IRVING MATERIALS, INC., | Re: Dkt. No. 201 |
| Defendant. | |

Plaintiff and Counterdefendant Jeffery Dean Black ("Black") filed the instant lawsuit against Defendant and Counterclaimant Irving Materials, Inc. ("Irving"). Black asserted a reverse domain name hijacking claim and a declaratory relief claim to the effect that Black's use of the imi.com domain name was not unlawful, and to prevent the transfer of that domain name from Black to Irving. Irving asserted counterclaims for cybersquatting and for declaratory relief seeking to transfer the imi.com domain name from Black to Irving. Before the Court is Black's motion for attorney's fees. Having considered the parties' briefing, the relevant law, and the record in this case, the Court DENIES Black's motion for attorney's fees.

I.      **BACKGROUND**

    **A. Factual Background**

**1. Black Registers imi.com and Incorporates Internet Marketing Inc.**

Since at least the mid-1990s, Black has invested significant time and money developing various internet entities, projects, and businesses. ECF No. 210 at 178–82. Black is also one of the first people to register domain names: "I was again one of the main speakers in the world going around talking about the internet is coming to get people to go online. My job was kind of, let me help convince all of the people in the world that this new thing, going from what we called the ARPAnet at the time, which only colleges used, and let's get people to go on to the internet. Something you take for granted today, back then it was all dial up. No one was doing it. My job was to make awareness to everybody in the world why they should do that." *Id.* at 182:20–183:4.

In March of 1994, Black acquired and registered for free the domain name at issue in this case, imi.com. *Id.* at 183:15–184:5, 191:19–23. Black associated his home address, his home phone number, his cell phone number, and his pager with the imi.com domain name from 1994 to 2019, and all of this information was listed on WHOIS. *Id.*; ECF No. 211 at 281:11–14.

On April 6, 1994, Black also incorporated an entity named Internet Marketing Inc., which was the first company Black ever created. ECF No. 210 at 197:12–18, 236:20–22; BX-2 (Certificate of Incorporation of Internet Marketing Inc.). At the time Black created Internet Marketing Inc., Black was not aware of any other "IMI" business. ECF No. 210 at 191:10–14. When Black registered imi.com, Black was not aware of Irving Materials, Inc. ("Irving"): "I had no idea who Irving Materials was. I had never been out in Indiana. I've never seen any of their trucks driving here in California. I had no intent at all to profit off of their site." ECF No. 211 at 303:12–304:10.

Black testified that the first thing he did with Internet Marketing Inc. and the imi.com domain name after he registered it was that he started building some directories and spiders, which Black explained were "some software that [he] would write that would say, 'I want you to go out to every, every machine on the internet, and on your way, keep track of every little machine you bounce to, or routers.'" ECF No. 210 at 184:13–185:1, 201:9–14. Black further explained: "then I reversed that backwards and turned that into the first internet service provider listing in the world

that would show how many people were behind each ISP at the time. An ISP is an internet service provider." *Id.* at 184:13–185:1.

In 1994, Black used imi.com to create a website that displayed "Internet Marketing, Inc." across the top of the page. *Id.* at 185:2–6; JX-5 (copy of imi.com from 1998). The Internet Archive Wayback Machine, available at archive.org, was not created until 1996 and did not start collecting websites until mid to late 1997, so the Wayback Machine did not have a copy of imi.com from 1994 to 1996. ECF No. 210 at 188:3–14. Black explained that in 1994, 1995, and maybe part of 1996, imi.com described Internet Marketing Inc. as a "data aggregator." *Id.* at 230:14–232:5.

Black used imi.com and Internet Marketing, Inc. to hold the data of his clients, and to create internet directories. *Id.* at 188:16–189:16. Black displayed the IMI mark on his website, documents, around 30 or more non-disclosure agreements, business plans for corporations, presentations and pitch decks. *Id.* at 189:23–190:8, 203:3–17. Black shared his IMI mark with companies, including Oracle, Microsoft, Yahoo, Digital Equipment, American Business Information, NW Ayer Incorporated, Excelsior, and Digex. ECF No. 210 at 215:1–8, 216:8–221:14. Black does not have many records left from Internet Marketing Inc. because Black sold the company to AltaVista for $25 million, and the records then became AltaVista's property. *Id.* at 203:17–25.

### 2. Black Changes the Corporate Form of Internet Marketing Inc.

Black rolled Internet Marketing Inc. into two other entities. *Id.* at 232:11–25. Specifically, Internet Marketing Inc. started as an S Corp that was tied to Black's social security number, but because venture capitalists would not fund S Corps, Black had to change the corporate form. *Id.* at 232:11–25, 236:13–22. Thus, Internet Marketing Inc. was rolled into a company called iChannel in 1996, which was then later rolled into iAtlas in 1998. *Id.* at 236:15–16; ECF No. 211 at 277:12–16, 312:16–314:4. Black worked with the law firm of Hale & Dorr to make sure that all of Internet Marketing Inc.'s records moved with the new companies. ECF No. 210 at 232:11–25.

### 3. Acquisition by AltaVista

Case No. 17-CV-06734-LHK
ORDER DENYING JEFFERY DEAN BLACK'S MOTION FOR ATTORNEY'S FEES

Black then entered into negotiations to sell iAtlas to AltaVista. Around October 1998, AltaVista specifically asked Black to take the imi.com website down to avoid any confusion about the company's name. ECF No. 210 at 241:21–25, 249:24–250:16; ECF No. 211 at 279:20–280:9. Black thus took imi.com down in October 1998. ECF No. 210 at 241:21–25, 249:24–250:16; ECF No. 211 at 279:20–280:9.

In 1999, Black sold iAtlas to AltaVista for $25 million. ECF No. 210 at 237:24–238:15; ECF No. 211 at 277:12–22, 314:5–10; BX-13.[1] This transaction included all of the assets from Internet Marking Inc. going back to 1994, with the exception of the imi.com domain name, which AltaVista allowed Black to keep. ECF No. 211 at 277:12–278:21. Black then went to work for AltaVista. *Id.* at 314:6–9.

### 4. Black's Other Domain Names

In 1994, Black also registered other domain names, including "hiking, biking, scuba, tennis, recreation, hotels.com, [and] resorts.com. Obviously, IMI was the first one I did. There might be a couple others that I did," perhaps "ten, fifteen, something like that. They're all generic terms." ECF No. 210 at 191:24–192:25. Black's plan for hotels.com and resorts.com was to build the first online booking reservation system in the world. *Id.* For hotels.com, Black built a booking reservation system complete with maps, and hand coded over 40,000 hotels into the database. *Id.* at 193:18–194:15. Black ultimately sold resorts.com in 1999 for $950,000 and hotels.com in 2001 for $11 million. *Id.* at 195:8–21. Black gave away the hiking, biking, scuba, tennis, and recreation domain names for free. *Id.* at 195:22–197:11.

### 5. Irving Materials, Inc.

Defendant and Counterclaimant Irving is an Indiana concrete and construction materials supplier that does business in Indiana, Kentucky, Tennessee, Illinois, Ohio, Michigan, and Alabama. ECF No. 212 at 652:9–11.

At trial, the jury heard evidence about Irving's use of its IMI trademark. Jason Richmond,

---

[1] AltaVista was later acquired by Overture, which was then acquired by Yahoo. ECF NO. 210 at 237:24–238:15.

Irving's Director of Marketing and Business Development, testified that between 1965 to the present, Irving used the IMI trademark on fleet vehicles, ready mix concrete trucks, uniforms, building signage, billboards, business cards, price sheets, marketing materials, and promotional items. *Id.* at 635:13–636:7; D Ex.1. In 1962, Irving built the corporate office in Greenfield, Indiana and displayed the IMI trademark on the front of that office. ECF No. 212 at 643:1–9; D Ex.1 at 85–86. Irving introduced into evidence a brochure from the 1962 original open house when Irving moved into the new corporate headquarters that displayed the IMI trademark. 6/14/19 Transcript at 647:19–24; D Ex.1 at 45–49. In 1968, Irving displayed the IMI trademark on the company letterhead. 6/11/19 Transcript at 645:22–646:5; D Ex.1 at 266–67. In 1981, Irving displayed the IMI trademark and the goods that Irving provides—"concrete, gravel, stone, and sand"—on a brochure that Irving handed out to customers. 6/14/19 Transcript at 648:6–18; D Ex.1 at 2–5. Irving has displayed the IMI trademark on Irving's website, irvmat.com, since 1996. 6/14/19 Transcript at 636:21–23.

McPherson testified about Irving's registration of its IMI trademark. Irving filed its trademark registration application on September 19, 1994, and Irving's IMI trademark was registered on September 19, 1995. ECF No. 211 at 519:5–18; D Ex.11. The specific goods covered by the registration were "concrete and construction aggregates, including sand, gravel, stone, and concrete in Class 19." *Id.* at 519:13–19; D Ex.11. In its registration, Irving stated that Irving first used IMI on January 1, 1965, and that it first used IMI in commerce on March 1, 1991. ECF No. 211 at 519:20, 525:11–17; D Ex.11. The United States Patent and Trademark Office registered the IMI trademark without requiring any proof of secondary meaning. ECF No. 199 at 7:1–7; ECF No. 211 at 519:5–18.

### 6. Irving Offers to Buy imi.com from Black

Jerry Howard, Irving's Vice President of IT and former Director of IT, testified that Irving's website is irvmat.com. *Id.* at 397:14–20. Irving first put up its website in 1996. ECF No. 212 at 636:21–23. Howard first learned of the imi.com domain name in 1998. *Id.* at 402:22–24. Howard explained that from a search on WHOIS, Howard learned that Black was the owner of

imi.com and that Black had registered imi.com in 1994. *Id.* at 405:1–11.

In the summer or fall of 1998, Howard approached Black to buy the imi.com domain name for Irving. ECF No. 210 at 240:22–241:8; ECF No. 211 at 415:9–25. Howard had between two to five calls with Black regarding purchasing imi.com. *Id.* at 415:24–416:16.

Black explained that at the time Howard approached Black in 1998, Black was not looking to sell imi.com. ECF No. 210 at 240:22–241:8. According to Black, Irving offered Black $500 for his imi.com domain name, which Black rejected. *Id.* at 242:2–15. Black testified at trial: "I said, I'm sorry. Hold on. Let me explain something here. My business is called Internet Marketing, Inc. It's still running. I'm the biggest spider in the world for what I do. I track more data than anybody else in the world as a data aggregator. $500 isn't going to cut it." *Id.* Black testified that he calculated what it would cost him to convert everything over, including his DNS servers, his web content, software, and contracts, and that in light of these calculations, Black would not consider any offers below $135,000. *Id.* at 242:16–243:7.

According to Howard, Howard never offered to purchase imi.com for $500. ECF No. 211 at 416:4–13. Instead, Howard offered to purchase imi.com for $5,000 then $10,000. *Id.*; ECF No. 212 at 609:25–610:8. Howard testified that Black rejected the $5,000 and $10,000 offers; that Black said that those offers were too low; and that Black said he had turned down offers of more than $100,000. *Id.* at 609:25–610:8; ECF No. 211 at 416:11–417:13. Howard testified that he does not recall Black mentioning the $135,000 figure. *Id.*

According to Black, Irving refused his $135,000 figure, repeated the $500 figure, and threatened to sue Black for trademark infringement. In fact, on October 2, 1998, Irving emailed Black a draft complaint suing Black for trademark infringement in the United States District Court for the Southern District of Indiana, in Indianapolis. ECF No. 210 at 243:4–25, 248:1–249:7.

As explained above, around that same time, in October 1998, Black had taken the imi.com website down at the request of AltaVista. *Id.* at 241:21–25, 249:24–250:16; ECF No. 211 at 279:20–280:9. Black testified that on October 7, 1998, Black emailed Irving to tell Irving that Black took the imi.com website down and that there could be no infringement. ECF No. 210 at

6

United States District Court
Northern District of California

247:22–250:9.

To handle Irving's threats to sue for trademark infringement, Black hired litigation attorneys to represent him. ECF No. 210 at 243:19–248:7. Black testified that his attorneys handled the situation with Irving and told Black that he would not hear from Irving again. *Id.* at 243:19–244:11, 250:11–16. Indeed, Irving never filed the suit for trademark infringement in the United States District Court for the Southern District of Indiana. *Id.* at 251:22–25; ECF No. 212 at 610:22–24.

Jerry Howard, Irving's current Vice President of IT and former Director of IT, testified that Black had stated that he had taken the imi.com website down. ECF No. 211 at 424:22–426:21. Howard explained that Irving ultimately did not sue Black "because he responded to our lawyers indicating—or acknowledging the trademark infringement and indicated that he was taking the website down. ECF No. 212 at 610:22–611:3. Howard confirmed that imi.com was down as of October 1998. ECF No. 211 at 424:22–426:21.

Howard would randomly check to confirm imi.com was still down from October 1998 on, but he stopped after a year and a half or two because "it didn't seem like there was any need to check anymore," the website "had been down for a longer period of time," and "based on what I saw in the [October 7, 1998] email, I never thought it would come back up." *Id.*

**7. Black Receives Other Offers to Buy imi.com Between 2000–2002**

Black left AltaVista during the end of 2000 or the beginning of 2001. *Id.* at 280:1–25. Between 2000–2002, Black received offers from seven or more companies for the imi.com domain name. *Id.* at 284:19–285:16, 286:22–289:8. One of these offers included an offer from a company called Piezotronics for $2 million. *Id.* at 286:22–289:8. Black also testified that he was in discussions with Israeli Military Industries and that Black believes that their offer was upwards of $2 million. *Id.* at 374:1–16.

In response to these offers, Black eventually raised the price to $4 million. *Id.* at 376:4–16. Black testified that Black "overpriced" the domain name, and that the price increase drove the potential purchasers away. *Id.* at 376:17–19.

7

United States District Court
Northern District of California

### 8. Black Puts imi.com Back Up in 2002

Black testified that in 2002, Black put imi.com back up. Specifically, Black put up a free directory on imi.com for companies that used an "IMI" acronym. *Id.* at 281:9–282:2; JX-7 (screenshot of imi.com from 2002 showing directory of companies with IMI name). Black created the directory using the names of companies that had reached out to Black to purchase the imi.com domain name, including Irving. ECF No. 211 at 282:11–284:7. Black explained that Black was not trying to profit from these companies, but rather was redirecting to these companies' websites any traffic that came to imi.com but was intended for these companies. *Id.* However, Black testified that the directory consisted primarily of companies that had contacted Black to purchase the domain name. *See, e.g.*, *id.* at 283:3–5 ("The majority of these are companies that actually came to me saying, when I was down, basically saying, 'Hey, you want to sell it? Do you want to sell it?'"). One company requested to be removed from the directory, and one company requested to be added. *Id.* at 282:11–284:7. Black complied with both requests. *Id.*

On the imi.com website, Black also advertised that the imi.com domain name was for sale, but that he would not sell it for less than $2 million. *Id.* at 285:6–25. Black testified that his attorneys approved of his actions and that Black had no reason to believe that what Black was doing was illegal. *Id.* at 286:11–23. Ultimately, Black did not sell the imi.com domain name, and Black kept the directory on the website through 2018. *Id.* at 293:1–294:18.

### 9. Black Forms International Monetary Investments LLC

In 2016, Black incorporated a new company, International Monetary Investments LLC. *Id.* at 252:15–23, 294:19–296:24. In December 2016, Black decided to license his imi.com domain name to his International Monetary Investments LLC company. *Id.* at 296:25.

International Monetary Investments LLC entered into 300 contracts with clients, and a majority of the agreements were signed in 2016. *Id.* at 298:15–301:15. Because International Monetary Investments involved financial services, Black had to track every one of his contracts and register the contracts with the United States Treasury Department. *Id.* at 298:4–25. Black testified that because the United States Treasury Department scrutinized International Monetary

8

Investments LLC, Black was "not going to do anything wrong." *Id.* at 306:15–20. Black was required to notarize his International Monetary Investments LLC contracts and to have the other contracting party "run though" the Department of Homeland Security or Interpol to "make sure they're good people." *Id.* at 310:14–19.

**10. Irving Hires the Heavyweights and Changes Their Marketing Strategy**

Jason Richmond, Irving's Director of Marketing and Business Development, testified that in 2014, Irving developed a new marketing and branding strategy to shift Irving's investments to digital and online advertising. ECF No. 212 at 650:6–651:12. In 2015, Irving hired an advertising firm known as the Heavyweights. *Id.* at 652:17–653:9. In June through October of 2016, Irving and the Heavyweights interviewed employees and customers and learned that Irving is "known as IMI everywhere but online." *Id.* at 653:6–655:7. Thus, Irving sought to build its online presence.

Jeffrey McPherson, Irving's Vice President of Sales and Marketing, testified similarly. In 2014, after McPherson obtained his position as the Vice President of Sales and Marketing at Irving, Irving began conducting consumer research on Irving's marketing. ECF No. 211 at 497:17– 503:9. Irving then hired the Heavyweights, an advertising firm, to look into how Irving was branding. *Id.* McPherson testified that: "it was suggested to us," that "it would be good not to confuse the marketplace and we should go after imi.com." *Id.* at 503:10–15.

McPherson further testified that the advertising firm helped him look into the imi.com domain name and "it appeared that [Black] wasn't offering any goods or services through the web, and that's when [the advertising firm] informed me that [Irving] could hire an attorney" and file a Uniform Domain Name Dispute Resolution Policy ("UDRP") complaint. ECF No. 212 at 582:24– 583:2. McPherson looked up the imi.com website and saw that the website stated that imi.com was for sale and that "offers less than 2 million dollars will not be considered." *Id.* at 583:17– 84:6. McPherson thought that was a ridiculous offer. *Id.* at 584:4–9.

When asked "between 1998 and 2017, why did Irving not say a word to Black about his registration and use of the [imi.com] domain name?," McPherson responded: "different strategy we have right now after going through the research and things of that nature that we've gone

through. And also the way the website, social media apps and everything interact[s] with one another, it's my job to make sure our brand is consistent throughout our footprint, consistent throughout the country, consistent everywhere we operate." ECF No. 211 at 503:24–504:6.

Jerry Howard, Irving's Vice President of IT and former Director of IT, testified similarly. Specifically, Howard explained that he was prompted to look at Black's imi.com website sometime in 2017 after the advertising firm began its digital advertising efforts, and it was at that time that Howard learned of Black's relaunch of imi.com. ECF No. 212 at 614:13–616:10. Black never contacted Irving to tell Irving Black was planning on relaunching the website. *Id.* at 617:7–618:5. Howard testified that Irving did not approach Black in 2017 to buy the imi.com domain name because "from [1998] until 2018, the website had changed very little. There's—it didn't look like there was any more bona fide business in 2017 than there was in 1998, and in 2017, the price went from in excess [of] $100,000 to in excess of [$]2 million. And it seemed to be outrageous back then and unreasonable, and then it only got more unreasonable in 2017." *Id.*

### 11. Irving Files the UDRP Complaint Against Black in 2017

In October 2017, with the help of the Heavyweights advertising firm, Irving filed the UDRP complaint against Black. *Id.* at 584:9–11; ECF No. 211 at 301:14–21, 503:16–19.; ECF No. 210 at 252:7–19. Specifically, Irving alleged that Black was cybersquatting on the imi.com domain name, and Irving sought to transfer imi.com to Irving. *Id.*

### 12. Black files the Instant Suit

On November 21, 2017, Black filed the instant lawsuit, which seeks to enjoin Irving's efforts to force Black to transfer the imi.com domain name to Irving. ECF No. 1. On March 22, 2018, Black filed his first amended complaint. ECF No. 11.

At trial, Black testified that March 2018—four months after he filed the instant lawsuit— was the first time he could make changes to the imi.com website because that was when the UDRP suspension on imi.com was lifted. ECF No. 211 at 354:10–355:4. Jason Richmond, Irving's Director of Marketing and Business Development, testified as to Irving's allegations of Black's bad faith. For instance, Richmond confirmed that he saw a "for sale" page that

Case No. 17-CV-06734-LHK
ORDER DENYING JEFFERY DEAN BLACK'S MOTION FOR ATTORNEY'S FEES

"prominently advertised imi.com" and "clearly stated, please contact us, but not with offers less than $2 million" only shortly after Black filed the instant lawsuit. ECF No. 212 at 655:8–656:12. Richmond testified that while the instant lawsuit has been pending, the imi.com website has been blank. *Id.* at 656:13–19. However, Richmond testified that Black changed the imi.com website and that, as of June 14, 2019, the day of Richmond's testimony, the imi.com website said, "coming soon." *Id.* at 656:16–20.

## B. Procedural History

### 1. Black's Claims

In October 2017, Irving initiated a UDRP proceeding against Black for the imi.com domain name. On November 21, 2017 Black initiated the instant suit against Irving. ECF No. 1.

On March 22, 2018, Black filed his first amended complaint ("FAC") and asserted two claims: (1) declaratory relief for a finding that Black lacked bad faith intent and thus did not violate the Anti-Cybersquatting Consumer Protection Act ("ACPA") pursuant to 15 U.S.C. § 1114(2)(D)(v) ("Count 1" or "subsection (v) declaratory relief claim"); and (2) reverse domain name hijacking by Irving in violation of 15 U.S.C. § 1114(2)(D)(iv) ("Count 2" or "subsection (iv) claim"). ECF No. 11 ("FAC").

Black labeled Count 1, his subsection (v) declaratory relief claim, as "Declaratory Relief -- No Bad Faith Intent/Cyberpiracy (15 U.S.C. §§ 1114(2)(D)(v), 1125(d)(1)(B)(ii))." *Id.* 15 U.S.C. § 1114(2)(D)(v) provides:

> (v) A domain name registrant whose domain name has been suspended, disabled, or transferred under a policy described under clause (ii)(II) may, upon notice to the mark owner, file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful under this chapter. The court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(v). Thus, subsection (v) allows Black to seek injunctive relief to enjoin Irving's efforts to force Black to transfer the imi.com domain name to Irving. Black requested this very relief in his FAC. FAC at 11.

Black labeled Count 2, his subsection (iv) claim, as "Reverse Domain Name Hijacking (15

U.S.C. § 1114(2)(D)(iv)).” *See* FAC. 15 U.S.C. § 1114(2)(D)(iv) provides:

> (iv) If a registrar, registry, or other registration authority takes an action described under clause (ii) based on a knowing and material misrepresentation by any other person that a domain name is identical to, confusingly similar to, or dilutive of a mark, the person making the knowing and material misrepresentation shall be liable for any damages, including costs and attorney's fees, incurred by the domain name registrant as a result of such action. The court may also grant injunctive relief to the domain name registrant, including the reactivation of the domain name or the transfer of the domain name to the domain name registrant.

15 U.S.C. § 1114(2)(D)(iv). Thus, subsection (iv) allows Black to seek to hold Irving liable for a knowing and material misrepresentation and to seek damages under the ACPA.

### 2. Irving's Answer and Counterclaims

On May 21, 2018, Defendant and Counterclaimant Irving answered Black's amended complaint and asserted two counterclaims: (1) that Black violated the ACPA (15 U.S.C. § 1125(d)) ("ACPA cybersquatting counterclaim"); and (2) a declaratory relief counterclaim that seeks a declaration that Black violated the ACPA (28 U.S.C. § 2201). ECF No. 25.

### 3. Black's Answer to Irving's Counterclaims and Black's Defenses

On June 11, 2018, Black answered Irving's counterclaims and asserted several defenses, including: (1) the Safe Harbor defense under the ACPA; (2) laches; and (3) acquiescence. ECF No. 28.

### 4. The Summary Judgment Order and Black's Disregard of the Order

On February 22, 2019, both Black and Irving moved for summary judgment on all claims and counterclaims. ECF Nos. 66 & 70.

Black's Count 2 alleged a violation of subsection (iv). However, in the summary judgment briefing, Black asserted that his Count 2 was not a subsection (iv) claim and that it was actually a subsection (v) claim. ECF No. 83 at 4–5. In his summary judgment briefing, Black further asserted that subsection (iv) is "inapplicable," that Black had made a "typographical error," and that "[t]here is no justification to add the 'misrepresentation' element under subsection (iv)." *See id.* at 5 (citing ECF Nos. 70, 76, & 77).

In the May 6, 2019 summary judgment order, the Court held that Black's Count 2 alleged a

12

subsection (iv) claim and that Black could not change Count 2 on summary judgment. *Id.* Further, the Court held that Black did not defend and had in fact abandoned his subsection (iv) claim on summary judgment. *Id.* at 5–6. Thus, the Court entered judgment on Black's subsection (iv) claim in Irving's favor. *Id.*

In the May 6, 2019 summary judgment order, the Court also denied both Irving's motion for summary judgment and Black's motion for summary judgment as to Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim, and Black's subsection (v) declaratory relief claim. ECF No. 83 at 18. Specifically, the Court found that "[s]ummary judgment as to the three remaining claims rises and falls together on the issues of whether Irving's trademark [] is distinctive and whether Black acted with bad faith intent." *Id.* at 6. The Court found that genuine disputes of material fact as to distinctiveness and bad faith intent precluded summary judgment on all three claims. *Id.*

Thus, Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim proceeded to trial. Black's subsection (v) declaratory relief claim (Count I), through which Black sought to obtain injunctive relief enjoining Irving from its efforts to force Black to transfer the imi.com domain name to Irving, also proceeded to trial.

Despite the Court's May 6, 2019 summary judgment order, in the May 18, 2019 joint pretrial statement, Black's counsel requested relief for Black's subsection (iv) claim for Irving's violation of the ACPA by reverse domain name hijacking (Count 2). ECF No. 97 at 3 ("Mr. Black requests that the Court . . . [e]nter an order finding that Defendant engaged in reverse domain name hijacking in violation of the ACPA.").

Despite the Court's May 6, 2019 summary judgment order, on May 28, 2019, Black's counsel repeatedly proposed final jury instructions for Black's subsection (iv) claim for Irving's violation of the ACPA by reverse domain name hijacking (Count 2). *See, e.g.*, ECF No. 125 at 3 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking"); *id.* at 115–16 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking.").

13

Despite the Court's May 6, 2019 summary judgment order, on May 29, 2019, Black's counsel proposed questions for "reverse domain name hijacking against Irving" in his proposed verdict form. ECF No. 135 at 2.

### 5. Order Re: Motions in Limine and Pre-Trial Disputes and the Preliminary Jury Instructions

On May 29, 2019, the Court's Order Re: Motions in Limine and Pre-Trial Disputes stated that Black's subsection (v) declaratory relief claim (Count 1) entitled Black to injunctive relief and not damages. ECF No. 129. Specifically, the Court stated:

> Black is not entitled to seek monetary damages for his [subsection (v)] declaratory relief claim. The Court granted Irving's motion for summary judgment on Black's claim for reverse domain name hijacking in violation of 15 U.S.C. § 1114(2)(D)(iv). ECF No. 83 ("MSJ Order") at 4–6, 18. Therefore, Black's only surviving claim is a claim for declaratory relief regarding no bad faith intent/cyberpiracy pursuant to 15 U.S.C. §§ 1114(2)(D)(v) and 1125(d)(1)(B)(ii). *Id.* at 3, 17–18. Neither of those statutory sections provide a right for Black to recover monetary damages. Specifically, 15 U.S.C. § 1114(2)(D)(v) provides only that "[t]he court may grant injunctive relief to the domain name registrant, including the reactivation of the domain name or transfer of the domain name to the domain name registrant." 15 U.S.C. § 1125(d)(1)(B)(ii) provides that: "[b]ad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Therefore, the Court finds that Black is not entitled to seek monetary damages for his [subsection (v)] declaratory relief claim.

ECF No. 129 at 8.

### 6. Preliminary Jury Instructions

In the amended proposed preliminary jury instructions, filed on May 30, 2019, the Court described Black's subsection (v) declaratory relief claim as follows: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." ECF No. 131 at 3. Black did not object to this specific instruction in the amended proposed preliminary jury instructions. *See* ECF No. 137.

On June 4, 2019, the Court filed a second set of proposed preliminary jury instructions that made changes to the preliminary jury instructions unrelated to Black's subsection (v) declaratory

relief claim. ECF No. 147. Those proposed instructions again described Black's subsection (v) declaratory claim as follows: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." *Id.* at 3. On June 5, 2019, Black filed a notice of no objection. ECF No. 155.

Accordingly, the Court filed the final preliminary jury instructions on June 5, 2019, with the following instruction for Black's subsection (v) declaratory relief claim: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." ECF No. 159 at 3.

### 7. The Jury Trial, the Preliminary Jury Instructions, and Opening Statements

The Court held a jury trial on June 10, 2019, June 11, 2019, and June 14, 2019. ECF Nos. 167, 171 & 191.

On June 10, 2019, during the preliminary jury instructions, the jury was instructed as follows as to the parties' claims and defenses:

> To help you follow the evidence, I will give you a brief summary of the positions of the parties:
> Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. Mr. Black has the burden of proving his claim by a preponderance of the evidence.
> Irving Materials, Inc. denies Mr. Black's claim. Irving Materials, Inc. has asserted two counterclaims against Mr. Black: (1) that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act; and (2) a declaratory relief counterclaim that seeks a declaration that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act. Irving Materials, Inc. has the burden of proving its counterclaims by a preponderance of the evidence.
> Mr. Black denies Irving Materials, Inc.'s counterclaims and asserts three defenses: (1) the Safe Harbor defense under the Anti-Cybersquatting Consumer Protection Act; (2) the laches defense; and (3) the acquiescence defense. Mr. Black has the burden of proving each defense by a preponderance of the evidence.

ECF No. 159. at 3.

The jury then heard opening statements from both parties. Despite the Court's May 6, 2019 summary judgment order, the Court's Order Re: Motions in Limine and Pre-Trial Disputes,

and the preliminary jury instructions, Black's counsel in his opening statement requested that the jury find that Irving violated the ACPA, which is Black's subsection (iv) claim (Count 2) that was no longer part of the case. Therefore, the Court struck Black's counsel's improper statement in front of the jury. Specifically, the Court's exchange with Black's counsel on June 10, 2019 was as follows:

> Mr. Rodenbaugh: [Black is] also entitled to a declaration that Irving has violated the law with its exceptionally frivolous, disparaging crusade to steal Mr. Black's Property. Thank you.

> The Court: . . . You know, that last sentence, . . . you did not have a claim that Irving violated the law. So is there a reason why you said that in front of the jury when I ruled that was excluded? That is stricken.

> Mr. Rodenbaugh: Your honor, I'm sorry. That is not my understanding.

> The Court: I've stated multiple times what your declaratory relief claim is, and it's not that Irving violated the law. You want a declaratory relief claim that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. That is your only claim in this trial.

> Mr. Rodenbaugh: Okay, your honor.

> The Court: All right. So that last sentence is stricken. Mr. Black does not have a claim declaring Irving violated the law. All right? So you're not [to] consider that last claim. That's not a claim in this case.

ECF No. 210 at 164–65.

### 8. The Court Again Clarified Black's Remaining Subsection (v) Declaratory Relief Claim

On June 14, 2019, the Court clarified Black's remaining subsection (v) declaratory relief claim (Count 1) in court, outside of the presence of the jury. The Court explained that there was some confusion about Black's remaining subsection (v) declaratory relief claim, both because there is little case law on this claim, and because some courts—as well as the parties—referred to Black's remaining subsection (v) declaratory relief claim as also being titled "reverse domain name hijacking." ECF No. 212 at 574:17–577:17. However, the Court explained that in the preliminary jury instructions, the jurors were instructed as follows as to Black's subsection (v)

16

declaratory relief claim: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act." *Id.* The Court explained that the instruction is in line with the statutory text of subsection (v) because subsection (v) only provides declaratory relief for the person accused of cybersquatting. *Id.* Unlike subsection (iv), subsection (v), does not provide an affirmative claim against Irving. *Id.* Thus, the Court explained to the parties that it does not matter what Black's remaining subsection (v) declaratory relief claim is called, it is not an affirmative claim against Irving. *Id.* The Court stated: "[t]hat was your [sub]section (iv) claim which you called reverse [domain] name hijacking, and that claim I granted summary judgment to Irving on. It does not exist. It is not the subject of this trial." *Id.*

### 9. The Jury Trial, the Parties' Rule 50 Motions, the Jury's Verdict, and the Court's Findings of Fact and Conclusions of Law

During trial, the jury heard testimony from Jeffery Dean Black (Plaintiff and Counterdefendant), Jerry Howard (Irving's current Vice President of IT and former Director of IT), Dr. James Wright (Black's expert), Jeffrey McPherson (Irving's Vice President of Sales and Marketing), and Jason Richmond (Irving's Director of Marketing and Business Development).

After Black rested, Black moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 ("Rule 50") on his laches defense. The Court denied Black's motion. ECF No. 169.

On June 14, 2019, after Irving rested, both parties made Rule 50 motions. Specifically, Black again brought a Rule 50 motion on his laches defense, which the Court denied. ECF No. 185. Irving made several arguments in its Rule 50 motion, including that Irving was entitled to judgment as a matter of law on Black's acquiescence defense. Black conceded that he could not prove his acquiescence defense, so the Court granted Irving's Rule 50 motion on Black's acquiescence defense. *Id.* The Court denied Irving's remaining Rule 50 motion. *Id.*

On June 14, 2019, the Court instructed the jury on the final jury instructions, and the parties gave closing arguments. *See* ECF No. 212; ECF No. 186. The jury then deliberated.

The verdict form asked the jury to determine Irving's ACPA cybersquatting counterclaim, Black's Safe Harbor defense, and Irving's statutory damages. ECF No. 184. The verdict form also asked the jury to decide in their advisory capacity Black's subsection (v) declaratory relief claim and Black's laches defense. *Id.* The verdict form did not ask the jury about Irving's declaratory relief counterclaim because Irving explained at the Final Pretrial Conference that a decision on Irving's ACPA cybersquatting counterclaim would also be dispositive of Irving's declaratory relief counterclaim. ECF No. 149 at 20.

On June 14, 2019, the jury returned a verdict. ECF No. 190. Specifically, as to Black's subsection (v) declaratory relief claim, the jury in their advisory capacity answered "Yes" to the question: "Has Mr. Black proven by a preponderance of the evidence that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act?" *Id.* As to Irving's ACPA cybersquatting counterclaim, the jury answered "No" to the question: "Has Irving Materials, Inc. proven by a preponderance of the evidence that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act?" *Id.* Thus, the jury did not need to and did not reach questions regarding Black's Safe Harbor or laches defenses or Irving's statutory damages. *Id.*

The Court subsequently issued findings of fact and conclusions of law on August 10, 2019. ECF No. 199. The Court concluded that the jury's verdict that found that Irving did not prove its ACPA cybersquatting counterclaim by a preponderance of the evidence was supported by substantial evidence. *Id.* at 36. The Court also found that Irving did not prove by a preponderance of the evidence Irving's counterclaim for declaratory relief. *Id.* Finally, the Court found that Black proved by a preponderance of the evidence Black's declaratory relief claim that Black did not violate the ACPA. *Id.*

### 10. The Instant Motion for Attorney's Fees

On August 23, 2019, Black filed the instant motion for attorney's fees. ECF No. 201 ("Mot."). On September 6, 2019, Irving opposed the motion, ECF No. 204 ("Opp'n"), and on September 13, 2019, Black filed a reply, ECF No. 206 ("Reply").

## II.    LEGAL STANDARD

The Lanham Act permits an award of attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). In *Octane Fitness*, the United States Supreme Court recently reviewed Section 285 of the Patent Act, which similarly provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. In *Octane Fitness*, the United States Supreme Court held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

The Ninth Circuit has explained that the United States Supreme Court's decisions in "*Octane Fitness* and *Highmark* have altered the analysis of fee applications under the Lanham Act." *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (en banc). In particular, the Ninth Circuit has indicated that now, district courts should exercise equitable discretion and consider nonexclusive factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance compensation and deterrence," under a preponderance of the evidence standard. *Id.* (quoting *Octane Fitness, LLC*, 572 U.S. at 1756 n.6). A district court's decision whether to shift fees under the Lanham Act is reviewable only for abuse of discretion. *Id.*

When a losing party has not committed "independently sanctionable" conduct, such as "willful infringement" or "conduct that violates Fed. R. Civ. P. 11," it will be a "rare case" in which that party's "unreasonable conduct" will "nonetheless be so 'exceptional' as to justify an award of fees." *Octane Fitness, LLC*, 572 U.S. at 555; *see also Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1307 (Fed. Cir. 2018) (explaining that a district court need not award attorney's fees to prevailing party under parallel 35 U.S.C. § 285 fee-shifting provision, even following finding of inequitable conduct).

## III. DISCUSSION

As discussed in the foregoing, the Lanham Act dictates that the Court "in exceptional cases may award reasonable attorney fees to the prevailing party" in a case that involves an alleged

19

1  violation of 15 U.S.C. § 1125(d). 15 U.S.C. § 1117(a). Black argues that Black is entitled to

2  attorney's fees as the prevailing party with respect to Irving's ACPA cybersquatting counterclaim

3  under 15 U.S.C. § 1125(d).

4      In particular, Black claims that the instant case is "exceptional" for three reasons: (1)

5  Irving's ACPA cybersquatting counterclaim was objectively unreasonable, (2) "Irving's

6  motivation was foul," and that (3) Black succeeded on his own claim for declaratory relief under

7  15 U.S.C. § 1114(2)(D)(v). The Court considers these three arguments in turn. The Court then

8  proceeds to consider Irving's own argument that Black's manner of litigation in the instant case

9  militates against an award of attorney's fees. As is evident from the Court's discussion, Black

10  fails to demonstrate by a preponderance of evidence that the instant case is indeed "exceptional,"

11  such that attorney's fees are warranted.

12    **A. Irving's ACPA Cybersquatting Counterclaim Was Not Objectively Unreasonable.**

13      One of the factors that a court may consider in order to determine whether a case is

14  "exceptional" under 15 U.S.C. § 1117(a) is "objective unreasonableness (both in the factual and

15  legal components of the case)." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994). Here,

16  Black contends that Irving's ACPA cybersquatting counterclaim was objectively unreasonable in

17  terms of factual components. Mot. at 9–11. In particular, according to Black, Irving entirely

18  failed to produce evidence as to two required elements of Irving's ACPA cybersquatting

19  counterclaim: the distinctiveness of Irving's trademark and the bad faith of Black. Irving

20  disagrees. Irving asserts that Irving proffered evidence to support both of the foregoing elements.

21  Opp'n at 10–14. The Court agrees with Irving. Irving's ACPA cybersquatting counterclaim was

22  not objectively unreasonable.

23      In order for Irving to prevail on the ACPA cybersquatting counterclaim, the ACPA

24  required Irving to prove that (1) Black registered, trafficked in, or used a domain name; (2) the

25  domain name is identical or confusingly similar to a protected mark owned by Irving; (3) Irving's

26  trademark was distinctive at the time of Black's registration of the domain name; and (4) Black

27  acted with bad faith intent to profit from that mark. *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213,

28
20

United States District Court
Northern District of California

1218–19, n.10 (citing 15 U.S.C. § 1125(d)).  In the instant case, the parties stipulated that Irving met the first two elements.  ECF No. 199 at 23–24.  Thus, the dispute in the instant case focused only on the third and fourth elements of Irving's ACPA cybersquatting counterclaim.  *Id.* at 25–33.

The jury ultimately concluded that Irving did not prove the ACPA cybersquatting counterclaim by a preponderance of evidence, and the Court subsequently concluded that the jury's verdict was supported by substantial evidence.  ECF No. 199 at 23.  "However, an adverse determination by the jury, standing alone, is not a basis for finding exceptional circumstances." *Netlist, Inc. v. Diablo Techs., Inc.*, No.: 13-CV-5962 YGR, 2015 WL 5157315, at 1 (N.D. Cal. Sept. 1, 2015); *see also Caiz v. Roberts*, No. 15-09044-RSWL-AGRx, 2017 WL 830386, at *5 (C.D. Cal. Mar. 2, 2017) ("However, mere failure of proof on a claim or lack of success in a lawsuit is not sufficient to warrant a finding that a case is exceptional.").  Moreover, "[i]f a plaintiff has raised 'debatable issues' and can be found to have had a legitimate reason for bringing the lawsuit, it supports a finding that a case is not exceptional." *Nutrivita Laboratories, Inc. v. VBS Distribution Inc.*, 160 F. Supp. 3d 1184, 1192 (C.D. Cal. 2016).

Black's argument that Irving's ACPA cybersquatting claim was "objectively unreasonable" runs into an obvious difficulty: Black previously moved for summary judgment on Irving's ACPA cybersquatting counterclaim, but the Court denied the motion.  ECF No. 83.  In doing so, the Court reviewed the evidence and concluded that Irving had pointed to "a genuine dispute of material fact as to the distinctiveness of Irving's mark." *Id.* at 11.  The Court also concluded that Irving had shown "numerous genuine disputes of material fact as to whether Black acted with bad faith intent." *Id.* at 17.  It would strain logic for the Court to hold that Irving presented enough evidence to establish genuine issues of material fact with respect to the only two contested elements of Irving's ACPA cybersquatting counterclaim, but that the claim was also "objectively unreasonable" as a factual matter.  Indeed, courts have held that denial of summary judgment against a party constitutes evidence "that the party's claims were objectively reasonable and suitable for resolution at trial." *Medtronic Navigation, Inc. v. BrainLAB Mediznische*

United States District Court
Northern District of California

*Computersyteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010); *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2014 WL 4145499, at *9 (N.D. Cal. Aug. 20, 2014) (previous denial of summary judgment in a case "strongly suggests that this is not an 'exceptional' case as contemplated by 15 U.S.C. § 1117(a)").

Black points to *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, No. 15-CV-04618-WHO, 2017 WL 6059271 (N.D. Cal. Dec. 7, 2017), as an example of a case in which the court deemed a losing party's position to be objectively unreasonable "even though [the losing party]'s claims had survived summary judgment." ECF No. 201 at 11. However, *Sazerac* presented unique circumstances not present in the instant case. In *Sazerac*, the losing party did indeed survive summary judgment, but only as to claims for injunctive relief. *Sazerac*, 2017 WL 6059271, at *1. The motion for summary judgment "did not address the issue of irreparable harm." *Id.* at *8. The *Sazerac* court subsequently relied on the fact that the losing party "failed to produce any evidence of irreparable harm" to determine that the losing party "litigated unreasonably." *Id.* Thus, the *Sazerac* court had never previously held that there was a genuine issue of material fact with respect to the dispositive issue that rendered the losing's party's case objectively unreasonable.

By contrast, in the instant case, as explained *supra*, this Court *has* held there to have been genuine issues of material fact with respect to the two elements of Irving's ACPA cybersquatting counterclaim that Black now argues were objectively unreasonable. ECF No. 83 at 11, 17. The Court recounts the evidence in order to explain why Black's contention is incorrect.

　　*a. Evidence of Distinctiveness*

First, Black argues that Irving's ACPA cybersquatting counterclaim was objectively unreasonable as a factual matter because "Irving did not come close to proving its trademark was distinctive in 1994, as it produced no evidence of consumer perception or of the effectiveness of its advertising as of that time." ECF No. 201. Black does not elaborate on this argument. However, for the reasons discussed below, the Court rejects the argument.

The third ACPA cybersquatting counterclaim element required that Irving's IMI trademark was distinctive at the time of Black's registration of the imi.com domain name in 1994. To find

distinctiveness, the trademark must first be placed on a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). The latter three categories of marks are deemed inherently distinctive and are entitled to protection because they serve to identify a particular source of a product. *Id.* On the other hand, "[g]eneric marks are not capable of receiving protection because they identify the product, rather than the product's source." *KP Permanent Make-Up, Inc v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

Descriptive marks simply "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005). A descriptive mark receives trademark protection only when it establishes "secondary meaning" in the marketplace. *Id.* Secondary meaning occurs when "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (citation and brackets omitted). "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc.*, 505 U.S. at 769.

Black's argument that Irving's ACPA cybersquatting counterclaim was factually unreasonable because Irving "produced no evidence of consumer perception or of the effectiveness of its advertising as of that time" is fatally flawed. ECF No. 201. Black ignores the possibility that Irving's trademark was *inherently distinctive*, which would have obviated the need for such evidence. *See Two Pesos, Inc.*, 505 U.S. at 769 ("An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning."). In fact, Irving did indeed contend that the IMI trademark was inherently distinctive.

As Irving notes, Irving put forth evidence that could have supported the conclusion that the IMI trademark was inherently distinctive. For instance, Irving pointed to the fact that the United

23

States Patent and Trademark Office previously registered the IMI trademark without requiring any proof of secondary meaning.  ECF No. 199 at 7:1–7; ECF No. 211 at 519:5–18; D. Ex. 11.  The federal registration of the IMI trademark constituted presumptive evidence of inherent distinctiveness.  *See, e.g.*, *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009) ("[F]ederal trademark registration of a particular mark supports the distinctiveness of that mark . . . .  Registration alone may be sufficient in an appropriate case to satisfy a determination of distinctiveness.").  Irving also produced evidence that the IMI trademark did not describe the concrete and aggregate goods sold under the trademark, which supported the proposition that the trademark was inherently distinctive with respect to those products.  ECF No. 520:20–522:24; *see, e.g.*, *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203, 1222 (C.D. Cal. 2014) (holding that trademark was inherently distinctive in part because elements of the trademark "do not describe the product"); *see also Two Pesos, Inc.*, 505 U.S. at 774 ("Where secondary meaning does appear in the statute, it is a requirement that applies only to merely descriptive marks and not to inherently distinctive ones." (citation omitted)).

Thus, while the Court concluded that "Irving failed to produce any evidence showing consumer perception of the mark as of 1994, such as consumer surveys," ECF No. 199 at 27, and that "Irving further failed to produce evidence concerning the effectiveness or reach of its advertising," *id.* at 28, such evidence would have been unnecessary if the jury had accepted Irving's contention that the IMI trademark was inherently distinctive.

   b.  *Evidence of Bad Faith*

Second, Black argues that "Irving failed to prove that any of the nine denominated ACPA cybersquatting factors weighed in its favor."  Mot. at 9.  Irving disagrees, and cites numerous pieces of evidence that Irving presented to demonstrate that Black acted in bad faith for the purposes of the ACPA.  Opp'n at 10–14.  As an initial matter, and as outlined above, the fact that Irving ultimately failed to "prove" that Black acted in bad faith does not render the counterclaim unreasonable.  Instead, the proper question is whether Irving's claim was objectively unreasonable with respect to the bad faith element.  As the Court explains below, Irving's claim was not

24

objectively unreasonable with respect to the bad faith element.

Specifically, the fourth ACPA element required a finding that Black acted in bad faith. The ACPA lists nine nonexclusive factors to consider in determining whether a person has a bad faith intent to profit from the domain name, including but not limited to: (I) Black's trademark or other intellectual property rights, if any, in the domain name; (II) the extent to which the domain name consists of Black's legal name or a name that is otherwise commonly used to identify Black; (III) Black's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) Black's bona fide noncommercial or fair use of the trademark in a site accessible under the domain name; (V) Black's intent to divert consumers from Irving's online location to a site accessible under the domain name that could harm the goodwill represented by the trademark, either for commercial gain or with the intent to tarnish or disparage the trademark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) Black's offer to transfer, sell, or otherwise assign the domain name to the trademark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) Black's provision of material and misleading false contact information when applying for the registration of the domain name, Black's intentional failure to maintain accurate contact information, or Black's prior conduct indicating a pattern of such conduct; (VIII) Black's registration or acquisition of multiple domain names which Black knows are identical or confusingly similar to trademarks of others that are distinctive at the time of registration of such domain names without regard to the goods or services of the parties; and (IX) the extent to which the trademark incorporated in Black's domain name registration is or is not distinctive and famous.  15 U.S.C. § 1125(d)(1)(B).

"We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive." *Lahoti*, 586 F.3d at 1202 (internal quotation marks and citation omitted).  Indeed, "Congress did not mean these factors to be an exclusive list; instead, the most important grounds for finding bad faith are the unique circumstances of the case,

which do not fit neatly into the specific factors enumerated by Congress." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946–47 (9th Cir. 2002) (internal quotation marks and citation omitted).

In the instant case, Irving presented numerous pieces of evidence that Black engaged in bad faith for the purposes of the ACPA. First, Irving presented evidence that from 2002 to 2018, Black did not use the www.imi.com website to offer any goods or services, and that instead, Black used the website to advertise the domain name for sale. *See, e.g.*, ECF No. 211 at 341:7–24, 342:14–25, 343:1–5. Efforts to sell a domain name for financial gain may support a finding of bad faith. *See, e.g.*, *Lahoti*, 586 F.3d at 1203 (finding bad faith in part because the defendant "asked for as much as $72,500 to sell the Domain Name to Vericheck even though Lahoti had no interests associated with the 'Vericheck' name").

Black argues that Black's efforts to offer the IMI domain name for sale cannot support a finding of bad faith in the instant case because Black also maintained on the website a directory of other companies that used an "IMI" acronym during this period. According to Black, "Mr Black's [*sic*] directory of IMI-formative companies was a bona fide, not for profit service" under the ACPA. Reply at 3. However, Black testified that the directory consisted primarily of companies that had contacted Black to purchase the domain name. *See, e.g.*, ECF No. 211 at 283:3–5 ("The majority of these are companies that actually came to me saying, when I was down, basically saying, 'Hey, you want to sell it? Do you want to sell it?'"). Based in part on this fact, Irving's operative theory was that the directory Black established was only meant to drum up interest in the sale of the IMI domain name among potential purchasers and was therefore not, in fact, a bona fide service. *See id.* at 549:20–23 ("What he describes as a free directory was a list of companies who he either knew to be or thought would be interested in the domain name, including people who had come to him to ask to buy it in the past."); ECF No. 212 at 657:14–16 ("It almost appears as if they're trying to lure those companies [listed in the directory] into buying the website."); *see Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 849 (E.D. Mich. 2006) (explaining that a use of a domain name is "legitimate" if it is "for some purpose other than simply to profit from the value

26

of the trademark").

Second, Irving presented evidence that Black refused to consider offers for the IMI domain name below $2 million between 2002 and 2018. Opp'n at 12–13. Eventually, when several companies expressed interest in the domain name, Black then doubled the price to $4 million, a decision which drove the potential purchasers away. ECF No. 211 at 376:4–16, 25, 377:1–2 ("I reset to 4 million and they decided they didn't want it . . . ."). The Ninth Circuit has specifically held that "willingness to sell [a] Domain Name only for an exorbitant profit [is a] quintessential cybersquatting practice[]" and may constitute evidence of bad faith. *Lahoti*, 586 F.3d at 1203. While Black testified that Black had indeed received offers in the $2 million to $4 million range, Black also conceded that final $4 million price "overpriced" the domain name, which the jury could have concluded evinced bad faith. ECF No. 211 at 376:13.

Third, Irving presented behavior by Black after the conclusion of the UDRP proceeding that could have supported a finding of bad faith. In particular, after the adverse determination in the UDRP proceeding, Black removed the offer to sell the IMI domain name from the website and added a reference to a new entity, International Monetary Investments. *See* ECF No. 212 at 655:8–25, 656:1–12. As the Court previously explained, "the initiation of the UDRP proceeding and Black's subsequent actions are highly relevant to the 'bad faith' inquiry" because they could undermine Black's assertion of good faith. ECF No. 129 at 3–4; *see E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 276 (5th Cir. 2002) (explaining that numerous courts "have indicated that when a registrant first uses a web site after litigation begins, this undermines any claim that the use was in good faith or was a fair use under the ACPA"); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2d Cir. 2000) (considering bad faith factors and finding bad faith where new "use" was an attempt to avoid ACPA liability).

In light of the foregoing, the Court cannot say that Irving's ACPA cybersquatting counterclaim was objectively unreasonable as to the bad faith element. Black's further arguments on this subject are unpersuasive. Black points to the fact that "there was no confusion caused by Mr. Black's use of [the domain name], and thus that there was no legally cognizable harm to

United States District Court
Northern District of California

Irving." Mot. at 9.  However, unlike a trademark infringement claim, "an ACPA violation does not require a showing of likely confusion." *Northern Light Tech., Inc. v. Northern Lights Club*, 236 F.3d 57, 66 (1st Cir. 2001).  Instead, the second element of the ACPA requires that Black's domain name have been identical or confusingly similar to a protected mark owned by Irving. *DSPT Int'l*, 624 F.3d at 1218–19, n.10 (citing 15 U.S.C. § 1125(d)).  As discussed above, Black stipulated to the fact that "the imi.com domain name is identical to Irving Material, Inc.'s IMI trademark, and the jury was so advised," as required under the second element of the ACPA.  ECF No. 199 at 24.

Black's citation to *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, No. 4:16-CV-00427-DCN, 2018 WL 6186798 (D. Idaho Nov. 27, 2018), is inapposite for the same reason. *Nelson-Ricks* concerned a trademark infringement claim.  Accordingly, the *Nelson-Ricks* court relied in part on the fact that the plaintiff had "not provided a single example of customer confusion" to deem the case exceptional and to award attorney's fees. *See id.* at *3 (explaining that plaintiff had "not provided a single example of customer confusion" in support of trademark infringement claim).  Because the ACPA "does not require a showing of likely confusion," *Northern Light Tech., Inc.*, 236 F.3d at 66, Irving's failure to present evidence on that issue in the instant case does not render Irving's ACPA cybersquatting counterclaim objectively unreasonable.

Black also cites *AirFX.com v. AirFX, LLC*, No. CV 11-01064-PHX-FJM, 2013 WL 857976 (D. Ariz. Mar. 7, 2013), which Black argues is a "highly analogous case." Mot. at 10. However, Black misreads *AirFX.com*.  The *AirFX.com* court rejected an ACPA cybersquatting claim because the facts showed that the domain name "was registered more than two years before the AirFX mark existed." *AirFX.com v. AirFX, LLC*, No. CV 11-01064-PHX-FJM, 2012 WL 3638721, at *4 (D. Ariz. Aug. 24, 2012).  In the instant case, by contrast, Irving put forth evidence that Irving used the IMI trademark as early as January 1, 1965, and in interstate commerce as early as March 1, 1991, years before Black's March 1994 registration of the domain name.  ECF No. 199 at 2, 6; ECF No. 212 at 587:11–21.  Irving contended that the IMI trademark was inherently distinctive throughout this period.  Opp'n at 10.

United States District Court
Northern District of California

While Black's argument is somewhat unclear, Black appears to read *AirFX.com* for the proposition that no ACPA cybersquatting counterclaim could have existed in the instant case because Irving did not actually register the IMI trademark with the United States Patent and Trademark Office until September 1994, after Black had already registered the domain name. Mot. at 7, 10. Ninth Circuit case law squarely forecloses such a reading, and indicates that a plaintiff in fact need not ever register a trademark to bring a claim for cybersquatting under the ACPA. *See, e.g.*, *DSPT Internat'l*, 624 F.3d at 1222 (finding ACPA cybersquatting violation based on trademark "[e]ven though DSPT had not registered the 'EQ' mark").

In short, the Court concludes that Irving presented evidence to support the bad faith element of the ACPA cybersquatting counterclaim, such that Irving's position was not objectively unreasonable. Further, because the Court has concluded that Irving presented evidence to support both the distinctiveness and bad faith elements of the ACPA cybersquatting counterclaim, the Court concludes that Irving's ACPA cybersquatting counterclaim was not objectively unreasonable. The Court therefore proceeds to address Black's argument that Irving's motivation in asserting the ACPA cybersquatting counterclaim was illegitimate.

**B. Irving's Motivation Was Not Improper.**

Black asserts that the instant case is exceptional because of Irving's "foul" motivation in asserting the ACPA cybersquatting counterclaim. Mot. at 11. Irving responds that Black's contention is unsupported, and that testimony in fact suggests that Irving acted in good faith. Opp'n at 17. The Court agrees with Irving. Black fails to demonstrate that Irving's motivation was improper.

The Ninth Circuit has explained that a court may consider a party's "motivation" in order to determine whether a case is "exceptional" under 15 U.S.C. § 1117(a). *SunEarth*, 839 F.3d at 1181 (internal quotation marks omitted) (quoting *Octane Fitness*, 572 U.S. at 554 n.6). For example, "a finding of bad faith" on the part of the losing party may support an award of attorney's fees under the Lanham Act. *See Nutrivita Labs., Inc. v. VBS Distribution, Inc.*, 697 F. App'x 559, 560–61 (9th Cir. 2017) (noting that the absence of evidence of losing party's bad faith

United States District Court
Northern District of California

weighed against the award of attorney's fees).

The sole record evidence that Black cites to support the assertion that Irving's motivation was illegitimate is testimony that suggested that Irving brought the ACPA cybersquatting counterclaim in order "to make sure our brand is consistent." Mot. at 12. However, Black does not explain how Irving's desire to obtain a more consistent brand identity constitutes an improper motivation. Black asserts that Irving brought the ACPA cybersquatting counterclaim "solely for their own selfish business desires" and because Irving's "marketing people decided they wanted imi.com." Mot. at 17. However, the fact that Irving was motivated by business considerations is wholly unremarkable. *See, e.g.*, *Gametek LLC v. Zynga, Inc.*, No. CV 13-2546 RS, 2014 WL 4351414, at *3 (N.D. Cal. Sept. 2, 2014) (explaining that "aggressive litigation strategy . . . falls fort of conduct that has been found to justify fee-shifting even post-*Octane*").

Black also repeatedly asserts that Irving conducted itself as a "trademark bully" that sought to use the law "as a hammer to beat down legitimate business owners" in the instant case. Mot. at 12. Black cites no evidence whatsoever in support of these assertions. *See Sedgewick Homes, LLC v. Stillwater Homes, Inc.*, 5:16-CV-49, 2019 WL 2881616, at *1 (W.D.N.C. July 1, 2019) (denying motion for attorney's fees because "there [was] no evidence" to support the allegation that losing party's motivation was to harass a competitor); *Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 820 F. Supp. 2d 569, 574 (S.D.N.Y. 2011) ("Fiesta argues that Jovani brought this lawsuit in order to dominate its smaller competitors in the prom dress market, including Fiesta. However, Fiesta does not point to any direct or even circumstantial evidence of Jovani's alleged ulterior motive."). Indeed, Blacks points to no evidence that Irving made any misrepresentations, or that Irving acted pursuant to an illegitimate motive to harass Black rather than a good faith belief in the strength of Irving's own litigation position. *See Applied Info. Sciences Corp. v. eBay, Inc.*, 511 F.3d 966, 973 (9th Cir. 2007) (upholding denial of attorney's fees when plaintiff presented no proof that losing party "acted capriciously or pursued litigation to harass [], or that [losing party] intended to bring a meritless or unreasonable case"); *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1119 (C.D. Cal. 2019) (rejecting attorney's fees

when losing party was motivated by "subjective belief in the strength of its litigating position, which was ultimately rejected by the jury").

The Court therefore concludes that Black has failed to demonstrate that the instant case is "exceptional" because of any illegitimate motivation on the part of Irving. The Court proceeds to consider Black's final argument that Black's success on the 15 U.S.C. § 1114(2)(D)(v) claim is alone sufficient to render the instant case "exceptional."

**C. Black's Success on the Subsection (v) Declaratory Relief Claim Does Not Render the Instant Case "Exceptional."**

Black claims that the instant case is exceptional for the purposes of the Lanham Act because there have been few cases in which a plaintiff has prevailed on a 15 U.S.C. § 1114(2)(D)(v) claim, as Black did in the instant case. Mot. at 13–14. The Court disagrees.

Black's argument, while creative, does not establish that the instant case is exceptional. Black asserts that "the dearth of ACPA case decisions (just six of them, in 18+ years) in which the domain owner is the prevailing party, [] indicates that this is a very rare case and thus is exceptional." Reply at 2. Under Black's logic, merely *prevailing* on a 15 U.S.C. § 1114(2)(D)(v) claim is enough to render a case "exceptional." As an initial matter, this argument would read an automatic fee-shifting provision into 15 U.S.C. § 1114(2)(D)(v), a statute that conspicuously lacks one. *Compare* 15 U.S.C. § 1114(2)(D)(iv) (containing attorney's fee provision), *with* 15 U.S.C. § 1114(2)(D)(v) (lacking attorney's fee provision).

More fundamentally, Black's premise is fatally flawed. In *Octane Fitness*, the United States Supreme Court explained that "an 'exceptional' case is simply one that stands out from others *with respect to the substantive strength of a party's litigating position* (considering both the governing law and the facts of the case) *or the unreasonable manner in which the case was litigated.*" 572 U.S. at 554 (emphasis added). The question is therefore a comparative one. The question is how the instant case compares to "mine-run cases," not whether *ACPA cases in general are rare*. *Id.* at 555. The cases that Black cites in which other plaintiffs prevailed under 15 U.S.C. § 1114(2)(D)(v) demonstrate this straightforward point. Indeed, in the cases that Black

31

himself cites, the courts relied on the factors that the Court has already examined, such as substantive strength of litigation position and the losing party's motivation, not the number of "case opinions reported on Westlaw" that involve 15 U.S.C. § 1114(2)(D)(v). Mot. at 13; *see Domond v. PeopleNetwork APS*, 750 F. App'x. 844, 847 (11th Cir. 2018) (awarding attorney's fees "because the case was baseless," and because of the losing party's litigation conduct, including "threats" to prevailing party); *AirFX.com*, 2013 WL 857976, at *2 (awarding attorney's fees because claims were "groundless and unreasonable").

Accordingly, the Court concludes that Black's success on the subsection (v) declaratory relief claim does not independently render the instant case exceptional. Finally, the Court proceeds to consider the "manner in which the case was litigated," 572 U.S. at 554, another factor that the United States Supreme Court has dictated that the Court consider in the course of the attorney's fee analysis.

### D. The Manner in which Black Litigated the Instant Case Militates Against Attorney's Fees.

Irving notes that throughout the instant case, "this Court has clearly and unequivocally warned [Black] that he does not have either a claim for reverse domain name hijacking or any other affirmative claim against" Irving. Opp'n at 19. Notwithstanding this fact, Black repeatedly "ignored this warning," which militates against the award of attorney's fees in the instant case. *Id.* The Court agrees. The "unreasonable manner in which the case was litigated" by Black is an equitable factor that militates against the award of attorney's fees.

The United States Supreme Court has held that the Court may consider the "unreasonable manner in which the case was litigated" in the totality of circumstances that determine whether attorney's fees are appropriate. *Octane Fitness, LLC*, 572 U.S. at 554. For example, the Ninth Circuit has held that a party's persistent failure "to comply with court rules" is a relevant consideration. *Ketab Corp. v. Mesriani & Assocs., P.C.*, 734 F. App'x 401, 409 (9th Cir. 2018). In the instant case, Black "repeatedly tried to alter" Black's claim under 15 U.S.C. § 1114(2)(D)(v) during trial. ECF No. 199 at 15.

On February 22, 2019, both Black and Irving moved for summary judgment on all claims and counterclaims. ECF Nos. 66 & 70.

Black's Count 2 alleged a violation of subsection (iv). However, in the summary judgment briefing, Black asserted that his Count 2 was not a subsection (iv) claim and that it was actually a subsection (v) claim. ECF No. 83 at 4–5. In his summary judgment briefing, Black further asserted that subsection (iv) is "inapplicable," that Black had made a "typographical error," and that "[t]here is no justification to add the 'misrepresentation' element under subsection (iv)." *See id.* at 5 (citing ECF Nos. 70, 76, & 77).

In the May 6, 2019 summary judgment order, the Court held that Black's Count 2 alleged a subsection (iv) claim and that Black could not change Count 2 on summary judgment. *Id.* Further, the Court held that Black did not defend and had in fact abandoned his subsection (iv) claim on summary judgment. *Id.* at 5–6. Thus, the Court entered judgment on Black's subsection (iv) claim in Irving's favor. *Id.*

In the May 6, 2019 summary judgment order, the Court also denied both Irving's motion for summary judgment and Black's motion for summary judgment as to Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim, and Black's subsection (v) declaratory relief claim. ECF No. 83 at 18. Specifically, the Court found that "[s]ummary judgment as to the three remaining claims rises and falls together on the issues of whether Irving's trademark [] is distinctive and whether Black acted with bad faith intent." *Id.* at 6. The Court found that genuine disputes of material fact as to distinctiveness and bad faith intent precluded summary judgment on all three claims. *Id.*

Thus, Irving's ACPA cybersquatting counterclaim and declaratory relief counterclaim proceeded to trial. Black's subsection (v) declaratory relief claim (Count I), through which Black sought to obtain injunctive relief enjoining Irving from its efforts to force Black to transfer the imi.com domain name to Irving, also proceeded to trial.

Despite the Court's May 6, 2019 summary judgment order, in the May 18, 2019 joint pretrial statement, Black's counsel requested relief for Black's subsection (iv) claim for Irving's

violation of the ACPA by reverse domain name hijacking (Count 2). ECF No. 97 at 3 ("Mr. Black requests that the Court . . . [e]nter an order finding that Defendant engaged in reverse domain name hijacking in violation of the ACPA.").

Despite the Court's May 6, 2019 summary judgment order, on May 28, 2019, Black's counsel repeatedly proposed final jury instructions for Black's subsection (iv) claim for Irving's violation of the ACPA by reverse domain name hijacking (Count 2). *See, e.g.*, ECF No. 125 at 3 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking"); *id.* at 115–16 (Black is "affirmatively seeking a ruling that Irving has violated the ACPA by reverse domain name hijacking.").

Despite the Court's May 6, 2019 summary judgment order, on May 29, 2019, Black's counsel proposed questions for "reverse domain name hijacking against Irving" in his proposed verdict form. ECF No. 135 at 2.

On June 10, 2019, during the preliminary jury instructions, the jury was instructed as follows as to the parties' claims and defenses:

> To help you follow the evidence, I will give you a brief summary of the positions of the parties:
>
> Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. Mr. Black has the burden of proving his claim by a preponderance of the evidence.
>
> Irving Materials, Inc. denies Mr. Black's claim. Irving Materials, Inc. has asserted two counterclaims against Mr. Black: (1) that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act; and (2) a declaratory relief counterclaim that seeks a declaration that Mr. Black violated the Anti-Cybersquatting Consumer Protection Act. Irving Materials, Inc. has the burden of proving its counterclaims by a preponderance of the evidence.
>
> Mr. Black denies Irving Materials, Inc.'s counterclaims and asserts three defenses: (1) the Safe Harbor defense under the Anti-Cybersquatting Consumer Protection Act; (2) the laches defense; and (3) the acquiescence defense. Mr. Black has the burden of proving each defense by a preponderance of the evidence.

ECF No. 159. at 3.

The jury then heard opening statements from both parties. Despite the Court's May 6, 2019 summary judgment order, the Court's Order Re: Motions in Limine and Pre-Trial Disputes,

34

and the preliminary jury instructions, Black's counsel in his opening statement requested that the jury find that Irving violated the ACPA, which is Black's subsection (iv) claim (Count 2) that was no longer part of the case. Therefore, the Court struck Black's counsel's improper statement in front of the jury. Specifically, the Court's exchange with Black's counsel on June 10, 2019 was as follows:

> Mr. Rodenbaugh: [Black is] also entitled to a declaration that Irving has violated the law with its exceptionally frivolous, disparaging crusade to steal Mr. Black's Property. Thank you.

> The Court: . . . You know, that last sentence, . . . you did not have a claim that Irving violated the law. So is there a reason why you said that in front of the jury when I ruled that was excluded? That is stricken.

> Mr. Rodenbaugh: Your honor, I'm sorry. That is not my understanding.

> The Court: I've stated multiple times what your declaratory relief claim is, and it's not that Irving violated the law. You want a declaratory relief claim that Mr. Black did not violate the Anti-Cybersquatting Consumer Protection Act. That is your only claim in this trial.

> Mr. Rodenbaugh: Okay, your honor.

> The Court: All right. So that last sentence is stricken. Mr. Black does not have a claim declaring Irving violated the law. All right? So you're not [to] consider that last claim. That's not a claim in this case.

ECF No. 210 at 164–65.

On June 14, 2019, the Court clarified Black's remaining subsection (v) declaratory relief claim (Count 1) in court, outside of the presence of the jury. The Court explained that there was some confusion about Black's remaining subsection (v) declaratory relief claim, both because there is little case law on this claim, and because some courts—as well as the parties—referred to Black's remaining subsection (v) declaratory relief claim as also being titled "reverse domain name hijacking." ECF No. 212 at 574:17–577:17. However, the Court explained that in the preliminary jury instructions, the jurors were instructed as follows as to Black's subsection (v) declaratory relief claim: "Mr. Black has asserted a declaratory relief claim against Irving Materials, Inc. that seeks a declaration that Mr. Black did not violate the Anti-Cybersquatting

Case No. 17-CV-06734-LHK
ORDER DENYING JEFFERY DEAN BLACK'S MOTION FOR ATTORNEY'S FEES

Consumer Protection Act." *Id.* The Court explained that the instruction is in line with the statutory text of subsection (v) because subsection (v) only provides declaratory relief for the person accused of cybersquatting. *Id.* Unlike subsection (iv), subsection (v), does not provide an affirmative claim against Irving. *Id.* Thus, the Court explained to the parties that it does not matter what Black's remaining subsection (v) declaratory relief claim is called, it is not an affirmative claim against Irving. *Id.* The Court stated: "[t]hat was your [sub]section (iv) claim which you called reverse [domain] name hijacking, and that claim I granted summary judgment to Irving on. It does not exist. It is not the subject of this trial." *Id.*

Black's repeated failure to comply with the Court's orders constituted an unreasonable manner of litigation. *See Ketab Corp.*, 734 F. App'x at 409 ("[A]s the district court noted, Ketab failed to comply with court rules. Ketab realleged claims that the court had dismissed with prejudice without seeking the court's permission and failed to comply with local meet and confer rules."). Considered in light of the Court's "equitable discretion," this fact weighs against the award of attorney's fees to Black under 15 U.S.C. § 1117(a). *Octane Fitness,* LLC, 572 U.S. at 554 (internal quotation marks and citation omitted); *see, e.g.*, *Logic Devs., Inc. v. Apple Inc.*, No. C 13–02943 WHA, 2014 WL 6844821, at *3 (N.D. Cal. Dec. 4, 2014) (considering a party's failure to comply with court rules in addressing motion for attorney's fees).

In sum, considering the totality of the circumstances of the instant case, the Court concludes that the instant case is not the "rare case" in which Irving's "unreasonable conduct" was "so 'exceptional' as to justify an award of fees" under 15 U.S.C. § 1117(a). *Octane Fitness, LLC*, 572 U.S. at 555. For the reasons discussed in the foregoing, Black fails to demonstrate by the preponderance of the evidence that the instant case is "exceptional" under the factors set out by the United States Supreme Court, and Black's own manner of litigation weighs against the award of attorney's fees. Accordingly, the Court DENIES Black's motion for attorney's fees.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Black's motion for attorney's fees.

**IT IS SO ORDERED.**

36

Dated: January 6, 2020

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No. 17-CV-06734-LHK
ORDER DENYING JEFFERY DEAN BLACK'S MOTION FOR ATTORNEY'S FEES